[S. F. No. 16692. In Bank. Aug. 19, 1942.]

WEST PUBLISHING COMPANY (a Corporation), Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent.

John W. Preston and Orr, Stark & Kidder for Petitioner.

Earl Warren, Attorney General, H. H. Linney, Assistant Attorney General, and James E. Sabine and Valentine Brookes, Deputies Attorney General, for Respondent.

CURTIS, J.—An action was commenced by the state against the West Publishing Company, a Minnesota corporation, whose business is the publication of law books and legal periodicals and their sale to persons in various parts of the country, for the recovery of taxes levied upon the company under the California Use Tax Act. (Stats. 1935, ch. 361, p. 1297, as amended by Stats. 1937, ch. 401, 671, 683, pp. 1327, 1874, 1935; Stats. 1939, ch. 677, p. 2154; Deering's Gen.

Laws, Act 8495a.) The state alleged that the company failed to file returns with reference to its California business for the period extending from July 1, 1935, to December 31, 1939; that thereupon, under authority of section 10 of the Use Tax Act, an estimate of $900,000 was made as the amount of total sales price of the tangible personal property sold by the company during this time "for storage, use or other consumption in the State of California"; and that upon this basis the company's liability was determined to aggregate $36,922.50—consisting of $27,000 for use taxes, interest amounting to $4,522.50 and penalties in the sum of $5,400. Personal service of process was made upon three of the company's salesmen operating in this state and a copy of the complaint and summons was sent by registered mail to the company's home office in St. Paul, Minnesota. The company appeared specially in the action and moved to quash the service of summons therein on the ground that it is a foreign corporation engaged exclusively in interstate commerce and is not doing business in this state so as to be amenable to its process. In this connection the company also challenged the constitutionality of the Use Tax Act as applied to its local activities, claiming that its subjection to the requirements of the state tax would constitute a regulation and direct burden upon interstate commerce and would deprive it of its property without due process, in contravention of article 1, section 8, of the United States Constitution and section 1 of the Fourteenth Amendment to said Constitution. The motion was heard upon affidavits and oral testimony touching the conduct of the company's business affairs in this state, and was denied. The company now seeks a writ of prohibition to restrain the trial court from proceeding further in the action.

The petitioner's method of doing business with respect to California purchasers is substantially as follows:

Pursuant to a separate contract made with each, the exclusive right to solicit orders for its publications in California is granted by the petitioner to four salesmen, each of whom is allotted a separate section of the state and is of equal standing and authority. Under this contract the salesman must devote his entire time and attention to "the work of selling books and collecting and reporting upon accounts for" the petitioner, and as compensation for his services he is paid a salary and traveling expenses. All orders taken are

subject to acceptance or rejection by the petitioner at its home office in St. Paul, Minnesota. The petitioner's instructions to its salesmen recommend that each order be accompanied by the customer's check for the initial payment specified in the governing price list. However, where the particular circumstances suggest a different procedure, the salesman, guided by his information as to the customer's credit rating as furnished by the petitioner or obtained from an independent source, may exercise his judgment in the matter of arranging the sale on terms of a sight draft, bill of lading attached, C.O.D. or cash basis. Such deviation from the routine type of time transaction, with "title of books to remain in West Publishing Co. until paid for," is submitted to the petitioner for confirmation when the order is transmitted. If the petitioner accepts the order, it ships the books from its plant at St. Paul, Minnesota, direct to the purchaser, charges prepaid; if it rejects the order, it returns the advance payment to the salesman with instructions that he rewrite the contract on different terms or refuse it altogether. As part of his duties in the solicitation and transmission of orders, the salesman is required to send to the petitioner a daily report of his activities, including information as to financial rating and credit standing of prospective purchasers. Also the salesman must return once a year to the petitioner's home office in St. Paul, Minnesota, to receive instructions in his work and to report on conditions in his district.

If the sale is made on the installment basis as is the usual case, the customer, in response to periodic statements sent to him by the petitioner, forwards all remittances to the Minnesota office. The salesman keeps no record of these subsequent payments or of the status of the particular account. However, when he is so requested by the petitioner's credit department, the salesman assists in the collection of delinquent amounts. In this connection he is expressly authorized, if unable to obtain payment, to "endeavor to line up the account with advance checks dated at thirty day intervals." If the overdue account is not so referred to the salesman for attention, it is handled by a local attorney employed by the petitioner for such purpose or by the petitioner's traveling collector sent from the home office. Other than the post-dated check arrangement specified to be within the authority of the salesman to negotiate, any compromise of

claims or an adjustment involving the repossession of books is subject to the petitioner's approval. All routine complaints made to the petitioner relative to the prompt delivery of books and their condition upon arrival are referred to the salesman for settlement with the customer. With respect to such matters the salesman acts as "trouble shooter" for the petitioner in his assigned territory.

In addition to the orders obtained through the efforts of its salesmen—about 60 per cent of its total sales—the petitioner does a certain amount of business here in response to mail orders forwarded directly to the petitioner's home office from persons resident in this state. A further contributing factor to the petitioner's volume of sales in California is its practice of selecting a particular series of its law books supplementary to an earlier publication and sending it without previous order to all its established customers who are already owners of the prior edition. In so doing the petitioner anticipates that the customer will accept the later volumes thus forwarded to him and will pay for them in the course of direct negotiation with the petitioner at its home office. However, if the customer registers with the petitioner an objection to such method of sales promotion, it is the policy of the petitioner to refer the matter to the salesman operating in the district wherein the complaining customer is located. In such case the salesman attempts to adjust any misunderstanding which may have arisen and to persuade the customer to retain and pay for the later publication pursuant to the petitioner's statement of account.

The petitioner keeps here no bank account and no stock of books for the filling of its California orders; all shipments are made directly from the petitioner's plant at St. Paul, Minnesota, to the purchasers in this state, via a common carrier. The petitioner rents no office here and it makes no allowance to any of its resident salesmen for such purpose. However, each salesman has established headquarters with a law firm centrally situated in relation to his district: the focal points are Sacramento, San Francisco and Los Angeles —the law office in the latter city accommodates two salesmen while each of the other locations serves but one. The arrangement is substantially the same in each place. The salesman is allotted a section of the firm's library for shelving the books furnished him by the petitioner for use and display in the solicitation of orders, and certain desk space for the

storage of his order blanks and writing materials. In the room assigned to him as his workshop he attends to all his business correspondence and prepares his daily reports for transmittal to the home office, receives his mail and telephone calls and makes appointments for interviewing customers there or elsewhere. He usually spends a part of each day at his city headquarters. In exchange for these office conveniences and services accorded to the salesman the members of the law firm involved enjoy practically unrestricted use of the petitioner's books so placed in their library. The various sets are kept up to date by the petitioner and constitute a sizable and representative collection of law books — approximately 2,000 and 1,500 volumes being deposited in the San Francisco and Los Angeles offices, respectively. While the petitioner has not affirmatively undertaken to negotiate any office accommodations for its salesmen in this state, it has acquiesced in the arrangements made in the three localities mentioned for the display of its books and the centralization of its business operations. Moreover, the San Francisco and Los Angeles headquarters are listed in the respective telephone and building directories as addresses of the West Publishing Company. Such listings, while made at the instance of the lessee of the law suite concerned, are recognized by the petitioner in its extensive state advertising. For example, through various articles published in California legal journals and periodicals the petitioner for the past several years has advertised these locations as its "San Francisco office" and its "Los Angeles office," has invited prospective customers to inquire at these addresses "for full details," and has referred to its San Francisco and Los Angeles salesmen as its "local representatives." The petitioner has never qualified to do intrastate business in this state.

The single controversial issue to be decided in this proceeding is the question of jurisdiction of the respondent court to proceed with the trial of the action instituted by the state against the petitioner for the recovery of the use taxes for the period above mentioned. In determining the validity of the service of process in that suit, the legal significance which should be given to the above-recited facts relative to the petitioner's local activities is of controlling importance.

Relevant to the consideration of the present factual situation are the following sections of the Use Tax Act:

Section 3 (Stats. 1937, p. 1937) imposes an excise tax "on the storage, use or other consumption in this State of tangible personal property purchased from a retailer on or after July 1, 1935, for storage, use or other consumption in this State at the rate of three per cent of the sales price of such property." (This exaction is complementary to the California Retail Sales Tax (Stats. 1933, ch. 1020, as amended, Stats. 1935, ch. 351, 355, 357; Deering's Gen. Laws, 1937, Act 8493), which is a levy at the same rate upon the gross receipts of California retailers from sales of tangible personal property.)

Section 2, subdivision (b) (Stats. 1939, p. 2154) defines the word "use" as including "the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include the sale of that property in the regular course of business."

Subdivision (f) of the same section defines "retailer" as including "every person engaged in the business of making sales for storage, use or other consumption. . . ."

Section 6 (Stats. 1937, p. 1938) directs "every retailer maintaining a place of business in this State and making sales of tangible personal property for storage, use or other consumption in this State [not exempted under the law] . . ." to collect the tax imposed by the act from the purchaser, and specifies such tax "shall constitute a debt owed by the retailer to this State."

Section 24 (Stats. 1937, p. 1944) provides that "In any action brought under the provisions of this act process may be served according to the provisions of the Code of Civil Procedure and the Civil Code of this State or may be served upon any agent or clerk in this State employed by any retailer in a place of business maintained by such retailer in this State, in which case a copy of the process shall forthwith be sent by registered mail to the retailer at his principal or home office."

Whatever the form of a particular statute authorizing service of process upon the agent of a foreign corporation which has not complied with the qualifying laws of a state, it is a fundamental requisite under the federal Constitution that the corporation shall be "doing business" in the jurisdiction where the service is made to sustain its validity. (*Riverside etc. Mills* v. *Menefee*, 237 U. S. 189 [35 S. Ct. 579, 59 L. Ed. 910]; *People's Tobacco Co.* v. *American To-*

*bacco Co.*, 246 U. S. 79 [38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537].) Formerly the theory upon which the courts of a state assumed jurisdiction of a foreign corporation carrying on business within its borders was that of implied consent to such jurisdiction. (*Lafayette Ins. Co.* v. *French,* 18 How. (U. S.) 404 [15 L. Ed. 451]; *St. Clair* v. *Cox,* 106 U. S. 350 [1 S. Ct. 354, 27 L. Ed. 222].) The abandonment of this ''consent theory'' in favor of the ''corporate presence theory'' was foreshadowed in *St. Louis Southwestern R. Co.* v. *Alexander,* 227 U. S. 218 [33 S. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915B, 77]. The latter doctrine was summarized by Mr. Justice Brandeis in *Philadelphia & Reading R. Co.* v. *McKibbin,* 243 U. S. 264 [37 S. Ct. 280, 61 L. Ed. 710], as follows: ''A foreign corporation is amenable to process to enforce a personal liability, in the absence of consent, only if it is doing business within the state in such manner and to such extent as to warrant the inference that it is present there. And even if it is doing business within the state the process will be valid only if served upon some authorized agent.'' The determination of this jurisdictional question ''is often a matter of great difficulty and extreme nicety. No all-embracing rule as to what is doing business has been laid down.'' (Fletcher Cyclopedia Corporations, Permanent Edition, Vol. 18, § 8733.) In *Tauza* v. *Susquehanna Coal Co.,* 220 N. Y. 259 [115 N. E. 915, 917-918], the late Judge Cardozo commented upon the criterion of corporate presence in this connection as follows: ''If in fact it [the corporation] is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts,'' citing *International Harvester Co.* v. *Kentucky,* 234 U. S. 579 [34 S. Ct. 944, 58 L. Ed. 1479]. ''But there is no precise test of the nature or extent of the business that must be done. All that is requisite is that enough be done to enable us to say that the corporation is here.'' As was said in *International Harvester Co.* v. *Kentucky, supra,* each case must depend upon its own facts.

■ While it is clear from these general observations that the application of a practical test is necessary to determine the validity of the service of jurisdictional process upon a foreign corporation, certain fundamentals have been settled establishing that neither isolated business transactions

(*Hunter* v. *Mutual Reserve Life Ins. Co.*, 218 U. S. 573 [31 S. Ct. 127, 54 L. Ed. 1155]), nor the mere solicitation of business (*Green* v. *Chicago, Burlington & Quincy Ry.*, 205 U. S. 530 [27 S. Ct. 595, 51 L. Ed. 916]), nor holding stock in subsidiary corporations (*Peterson* v. *Chicago, Rock Island & Pac. Ry.*, 205 U. S. 364 [27 S. Ct. 513, 51 L. Ed. 841]; *People's Tobacco Co.* v. *American Tobacco Co.*, 246 U. S. 79 [38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537]), even to the point of complete control (*Cannon Manufacturing Co.* v. *Cudahy Packing Co.*, 267 U. S. 333 [45 S. Ct. 250, 69 L. Ed. 634]), nor advertising or demonstrating products (*Harrell* v. *Peters Cartridge Co.*, 36 Okla. 684 [129 Pac. 872, 44 L. R. A. (N. S.) 1094]), nor its listing in the telephone directory or having its name on the door of an office (*Philadelphia & Reading R. Co.* v. *McKibbin,* 243 U. S. 264 [37 S. Ct. 280, 61 L. Ed. 710]), nor the presence of a corporation official on personal business (*Riverside & Dan River Cotton Mills* v. *Menefee,* 237 U. S. 189 [35 S. Ct. 579, 59 L. Ed. 910]) will amount to the presence of the corporation. It is thus apparent that it is not *any* activity of a corporation in a state other than that of its residence which will justify the conclusion that it is ''doing business'' there, so as to make it amenable to process there, but it is the combination of local activities conducted by such foreign corporation—their manner, extent and character—which becomes determinative of the jurisdictional question. The term ''doing business'' within a state foreign to the one in which the corporation is organized and has its principal place of business is substantially defined by the Supreme Court of the United States as follows: ''The general rule deducible from all our decisions is that the business must be of such a nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the state or district where service is attempted.'' (*People's Tobacco Co.* v. *American Tobacco Co., supra;* see also, *Green* v. *Chicago, Burlington & Quincy Ry., supra*; *International Harvester Co.* v. *Kentucky, supra*.) A leading and oft-cited authority upon the question of the jurisdictional service of process is the case of *International Harvester Co.* v. *Kentucky,* 234 U. S. 579 [34 S. Ct. 944, 58 L. Ed. 1479]. In that case the State of Kentucky had instituted a criminal proceeding in its own courts against the Harvester Company for a violation of a

Kentucky anti-trust law. The precise point involved was whether or not the state court had jurisdiction, and it was held that it had irrespective of the fact that the company's local business was purely of an interstate character. The opinion in that case discloses the following facts: The company had sales agents within the state, soliciting orders which were sent to the home office in another state for approval and in response to which the machines of the Harvester Company were delivered in Kentucky. There was a continuous course of shipment of machines into Kentucky. All deliveries were made f.o.b. at some point outside of Kentucky. The agents had authority to receive money, check or draft in payment of debts due the company and to take notes payable at local banks. They were not permitted to have any headquarters or place of business within the state, though they were allowed to reside there. They likewise were prohibited from making contracts or settlements and from engaging in other transactions not specifically authorized. The court expressly distinguished this factual situation as constituting "something more than mere solicitation" of patronage, which circumstance in the ticket agency case of *Green* v. *Chicago, Burlington & Quincy Ry. Co.*, 205 U. S. 530 [27 S. Ct. 595, 51 L. Ed. 916], was deemed insufficient to bring the railroad corporation within the state for the service of process. The Supreme Court in the International Harvester Co. case said at p. 585: *"Here was a continuous course of business in the solicitation of orders which were sent to another state and in response to which the machines of the Harvester Company were delivered within the state of Kentucky. This was a course of business, not a single transaction.* The agents not only solicited such orders in Kentucky, but might there receive payment in money, checks or drafts. They might take notes of customers, which notes were made payable, and doubtless were collected, at any bank in Kentucky. This course of conduct of authorized agents within the state in our judgment constituted a doing of business there in such wise that the Harvester Company might be fairly said to have been there, doing business, and amenable to the process of the courts of the state." (Italics ours.)

The adjudicated cases since the Harvester Company decision are not in complete agreement as to the precise factors additional to "mere solicitation" which motivated the court

in that instance to sustain the jurisdiction of the Kentucky court. In the consideration of the question in *People's Tobacco Co.* v. *American Tobacco Co.,* 246 U. S. 79 [38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537], the authority of the agents in the Harvester Company case to receive payments in Kentucky was stressed as determinative of the amenability of the corporation to service there. Other leading authorities have viewed the *quantity* and *continuity* of the solicitation of business in Kentucky as the controlling feature of the decision, rather than the mere additional circumstance of collecting money. (*Tauza* v. *Susquehanna Coal Co.,* 220 N. Y. 259 [115 N. E. 915]; *American Asphalt Roof Corp.* v. *Shankland,* 205 Iowa 862 [219 N. W. 28, 60 A. L. R. 986].) In so holding, these last-mentioned cases emphasize the import of the italicized language in the above quotation from the Harvester Company opinion. In this connection the court in the Shankland case made the following observation at p. 870:

". . . The continuous course of business referred to was the *solicitation of orders,* which were sent to another state, and in response to which the machines of the Harvester Company were delivered within the state of Kentucky. The court said, 'This was a course of business,—not a single transaction.' It is true that the above language is followed by a reference to the fact that the agents were authorized to receive notes, drafts, checks, money, etc., and transmit the same to the Harvester Company. Such transactions were, however, merely formal acts, and involved the exercise of no discretion on the part of the agent, and were always referable to transactions closed by the approval of the order, and, no doubt, generally by the delivery of the machines. These transactions are not given significance in what the court terms a continuous course of business.

"The present Chief Justice of the New York Court of Appeals [the late Judge Cardozo], in an able opinion in *Tauza* v. *Susquehanna Coal Co.,* 220 N. Y. 259 [115 N. E. 915], refers to and quotes the identical language from the opinion of Justice Day in the *International Harvester Co.* case. The writer of the opinion in the New York case points out the difference in the facts in the *International Harvester Co.* and *Green* cases, and distinguishes them by saying that in the latter case the orders taken did not result in a continuous course of shipments from Illinois to Pennsylvania, the states referred to in the opinion."

These principles relative to observable presence of a corporation furnish a firm basis for holding that the petitioner under the facts presented by the record is ''doing business'' within this state in such manner and to such degree as to be amenable to the service of judicial process. A recapitulation of the salient features of the petitioner's local activities will illustrate the factual foundation for this conclusion—and irrespective of which interpretation of the Harvester Company case is followed. While the petitioner does not lease offices here, it has kept several thousand volumes of law books in this state continuously over a period of years and permitted its salesmen to use them as a means of paying office rent. As a result of this practice it enjoys the advantages attendant upon the establishment of a fixed and local habitation for the conduct of its business and the display of its publications. Through extensive advertising of these locations as its local addresses the petitioner indicates that it regards those places as its points of contact with the public here. At these headquarters the petitioner's salesmen receive necessary office accommodations for the effective prosecution of their work. For many years in response to the petitioner's continuous solicitation of orders there has been a systematic and regular flow of its law books into this state— with respect to the period of time here involved the petitioner concedes that its California sales amount to $160,000 annually, a ''substantial'' volume of business. The powers of the petitioner's salesmen are varied in nature and exceptionally broad in some instances, as will be noted. In addition to taking orders, they receive initial payments upon installment contracts and they make collections on delinquent accounts incident to the exercise of a limited discretion in negotiating a postdated check arrangement for the settlement of such matters. Of significance at this point of review is the activity of the salesmen in connection with the petitioner's practice of sending to its customers in this state as to whose credit rating it is satisfied, selected sets of books without prior order. Frequently sales of such unordered merchandise are in fact consummated by the salesmen here when they persuade these persons to retain these publications and to pay therefor in accordance with the petitioner's statements of account. This last-mentioned line of duty in particular emphasizes the responsibility of the salesmen for the conduct of the petitioner's local affairs.

Regarding the petitioner's method of doing business in California as an integrated whole and coordinated with the establishment of local headquarters in the manner above outlined as pivotal points of operation, it cannot be gainsaid that the petitioner "maintains" places of business and "makes sales of tangible personal property for storage, use or other consumption in this state." The petitioner's reference to numerous patent infringement cases (*Weller* v. *Pennsylvania R. Co.*, 113 Fed. 502; *General Electric Co.* v. *Best Electric Co.*, 220 Fed. 347; *American Electric Welding Co.* v. *Lalance & Grosjean Mfg. Co.*, [162 C. C. A. 166] 256 Fed. 34; *Winterbottom* v. *Casey*, 283 Fed. 518; *Zimmers* v. *Dodge Brothers*, 21 F. (2d) 152; *Elevator Supplies Co.* v. *Wagner Mfg. Co.*, 54 F. (2d) 937; *Wilson* v. *McKinney Mfg. Co.*, 59 F. (2d) 332; *New Wrinkle, Inc.* v. *Fritz*, 30 F. Supp. 89) as a guide for interpretation of the term "place of business" is of no avail here, for the jurisdictional elements entering into the determination of the validity of service of process in such cases have a special and restricted meaning under the terms of section 48 of the Judicial Code, 28 U. S. C. A. section 109. That statute provides that suits for patent infringement may be brought "in the district of which the defendant is an inhabitant, or in any district in which the defendant . . . shall have committed acts of infringement and have a regular and established place of business." The requisite acts of infringement contemplate the defendant's "making, selling or using of the infringing product." (*New Wrinkle, Inc.* v. *Fritz, supra*) and, in addition, "the defendant in the suit must have a regular and established place of business,—probably with reference to the acts of infringement." (*Weller* v. *Pennsylvania R. Co., supra*.) That a great deal more than the maintenance of a "place of business" is encompassed by the phrase "a regular and established place of business," as defined in these patent infringement cases, is illustrated by the federal court's reference in *Winterbottom* v. *Casey, supra*, to the jurisdictional words of section 48 as meaning "a place where the *same kind of business*, in kind, if not in degree, is carried on as is done at the home office or principal place of business of the person or company involved—a place where the manufacturing or selling or other acts constituting the activities of the business are made or done, respectively, in the usual course, and contracts or deliveries are made to the general public; where

orders of customers are received and attended to continuously at a fixed, permanent, 'regular,' 'established' place; in short, a 'branch' of the business." These few references to the express statutory requirements determinative of the jurisdiction of the federal courts in patent infringement cases are sufficient to demonstrate the inapplicability of such cases to the consideration of a foreign corporation's liability to service of process within the state for the purposes of general suit.

The petitioner's final challenge of the jurisdiction of the respondent court upon constitutional grounds is completely answered by the recent case of *Felt & Tarrant Manufacturing Co.* v. *Gallagher*, 306 U. S. 62 [59 S. Ct. 376, 83 L. Ed. 488], wherein the circumstances under which a foreign corporation engaged exclusively in interstate commerce manifests its presence in this state pursuant to the terms of the California Use Tax Act are discussed. In that case an Illinois corporation, while not qualified to do local business in California, leased offices in its own name in California, itself paying the rent, for the use of two general agents upon whom it conferred the exclusive right to solicit orders within the state subject to acceptance by the home office. The agents were prohibited from making collections, and all payments for goods ordered were made directly to the corporation. All goods delivered in California were shipped from one of the corporation's distributing points outside the state, sometimes directly to the purchasers and sometimes to the general agents, to save freight, who, in turn, delivered them to the purchasers. The corporation contended that since it did no intrastate business in California, any requirements that it act as the state's collecting agent for the use tax or that it insure payment if it failed to make collections from the users, constituted a direct burden upon interstate commerce as well as a denial of due process of law. In sustaining the state's claim that it might constitutionally apply to such non-resident corporation the provisions of the challenged statute, the Supreme Court of the United States referred to its earlier decision in *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 [57 S. Ct. 524, 81 L. Ed. 814], upholding the validity of similar Washington legislation as applied to goods of extra-state origin, and quoted therefrom as follows (306 U. S. 67): "The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end."

Thus, it follows from this decision that the local activities of a foreign corporation may be purely interstate and yet sufficient in character to bring such corporation within the jurisdictional limits of this state and so render it liable to service of process in a suit instituted under the California Use Tax Act.

Nor is the force of the Felt & Tarrant Manufacturing decision weakened, as the petitioner urges, by the fact that the Supreme Court of the United States denied certiorari in the case of *Brown* v. *J. B. Simpson, Inc.*, 314 U. S. 673 [62 S. Ct. 137, 86 L. Ed. —] (*J. B. Simpson, Inc.* v. *Gundry*, 297 Mich. 403 [298 N. W. 81]), thereby leaving unimpaired the decree of the Michigan Supreme Court that a foreign corporation qualified in Michigan and maintaining a branch office there cannot be compelled to collect the use tax on its exclusively interstate sales. Careful examination of the Michigan opinion reveals that the controlling factor was not lack of jurisdiction over the seller corporation, but the express language of the governing statute determining its nonapplicability to an out-of-state corporation wholly engaged in the interstate business of selling in Michigan. Insofar as the distinction between these two cases is pertinent to the jurisdictional question raised in this proceeding, it is sufficient simply to note here the limited scope of section 5 of the Michigan Use Tax Act, applying only to "every seller of tangible personal property for storage, use or other consumption in this state, *engaged in the business of selling at retail in this state*," in contrast to the broad terms of section 6 of the California Use Tax Act, requiring compliance by "Every *retailer maintaining a place of business in this State and making sales* of tangible personal property for storage, use or other consumption in this State." (Italics ours.)

In line with our conclusion that the nature and range of the petitioner's local activities classify it as a retailer maintaining places of business and doing business within this state "in such manner and to such extent as to warrant the inference that it is present" here for purposes of suit, the binding force of the service of process upon the petitioner is not open to question. The provisions of section 24 of the California Use Tax Act were strictly followed by the personal service of summons and a copy of the complaint upon each of three of the petitioner's resident agents, and a copy of the summons and complaint was sent by registered mail to the petitioner's home office in St. Paul, Minnesota.

For the foregoing reasons the alternative writ of prohibition heretofore issued is discharged and the petition for a peremptory writ is denied.

Gibson, C. J., Shenk, J., Edmonds, J., and Carter, J., concurred. Traynor, J., did not participate herein.

Petitioner's application for a rehearing was denied September 14, 1942. Traynor, J., did not participate herein.