[Civ. No. 8819. Third Dist. June 29, 1955.]

DURALADD PRODUCTS CORPORATION (a Corporation), Petitioner, v. SUPERIOR COURT OF SACRAMENTO COUNTY et al., Respondents.

Archibald D. McDougall for Petitioner.

C. Ray Robinson for Respondents.

SCHOTTKY, J.—Petitioner, a New Jersey corporation, filed in this court a petition for a writ of prohibition to enjoin the Superior Court of Sacramento County from proceeding further in an action for personal injuries brought against it and others by Carl E. Moore, and to vacate an order denying petitioner's motion to quash the substituted service of summons made on it in said action. Attached to said petition as exhibits were copies of the first amended complaint, plaintiff's affidavit for service of process on a foreign corporation, notice of motion to quash service of summons and affidavit in support thereof, and pertinent

extracts from depositions of John B. Lindquist and Eleanor C. Lindquist.

Plaintiff, Carl E. Moore, as the real party in interest, filed an opposition to the issuance of the writ of prohibition. We issued an alternative writ requiring respondent court to show cause why further proceedings against petitioner in said action should not be prohibited and restraining further proceedings against petitioner until this court determined the matter.

It is the contention of petitioner that it was not doing business in California and was therefore not amenable to service of process upon the Secretary of State. The same record is before us as was before the superior court upon the hearing of the motion to quash service of summons. In support of its motion petitioner submitted the affidavit of Charles S. Schulek, a vice president of the Duraladd Products Corporation, and plaintiff and respondent Moore relied upon the affidavit of his attorney filed in support of the motion for service of process and the depositions of John B. Lindquist, Eleanor C. Lindquist and Louis C. Larson. The question which we must determine is whether the court's order denying petitioner's motion to quash the service of summons is supported by the record.

The facts are not in substantial dispute. The action is one for personal injuries resulting to plaintiff from the collapse of an aluminum ladder which had been purchased from defendant, Sacramento Stucco Company. The latter had obtained the same through the wholesale hardware firm of defendant Thomson-Diggs Company, which in turn had received it from defendant Louis C. Larson, a San Jose distributor. Larson, in turn, had purchased it from defendant Larson Ladder Company, a Los Angeles concern, which was engaged in the business of producing such ladders and selling them to distributors, of which Larson of San Jose handled the northern California business.

Larson of Los Angeles operates under a contract with Duraladd, whereby it purchases from Duraladd in New Jersey ladder parts which are shipped to Los Angeles and paid for by the Los Angeles company. These ladders arrive in a ''knocked down'' condition. They are there assembled and sold to dealers. The volume of business so done in 1952 approximated $25,000. It was less than that in 1951, and more in 1953. The contract under which this arrangement is still being carried on was entered into in 1950, between

Duraladd and Larson of Los Angeles, and provided for outright sale of ladder parts under an exclusive distributorship arrangement. Duraladd manufactures these parts solely in its New Jersey plant; maintains no sales, or other representatives, or office in California; does no business with any other firm or person than Larson of Los Angeles, with whom it has the contract mentioned which it terms a licensing agreement.

The affidavit of its vice president asserts that the only connection Duraladd has with California is the sale of ladder parts to Larson of Los Angeles under this agreement, a copy of which is attached to Duraladd's affidavit; and that no officer of Duraladd has done business in California since its president, one Dold, came to California in 1950 to execute the contract. However, it appears from other evidence that when Larson started to set up its ladder assembly business in Los Angeles, a representative of Duraladd came to California and assisted in setting up the assembling machine and gave instruction in the method of operating it. Since that time Duraladd has had a man at Larson's plant several times, though not recently. This was the same man who helped set up Larson's operation and he dropped in to see how it was operating. About two years ago, Larson also received some instructions from Duraladd in regard to the assembly of the ladders. Larson also has received technical information from Duraladd as to tests, strength, and composition of their products.

The machine used in this assembly process is called an "air machine," operated by one person, and it applies 380 pounds air pressure, by which the ladder rungs are annealed to the side of the rails. There is no welding, and there are no screws or rivets used in the process. Larson has assembled over 1,000 of these ladders since 1950. This air machine was designed by Duraladd and purchased by Larson from Duraladd's representative in Wisconsin. If anything goes wrong with the machine, Larson does not go to Duraladd, but to an air company in Los Angeles. The ladders, themselves, are Duraladd's design and manufacture. All parts arrive in Los Angeles machined, stamped, and ready to be assembled. Larson does no machine work on the parts; merely assembles them. The rungs are all cut to size and packed in barrels. The ladder dogs or catches (for extension arms) are already attached.

Duraladd does no advertising in California, but Larson

puts out a catalog sheet, a copy of which has been submitted as an exhibit. This sheet or brochure contains at the top the following letters:

"ALUMINUM LADDERS
LARSON LADDER COMPANY
DISTRIBUTORS FOR DURALADD, THE
LIFETIME LADDER."

It appears that Duraladd furnished the dies for this brochure and composed the copy, but Larson had it printed and paid for it. Larson put its name on as distributors for Duraladd and sent this brochure out to wholesalers as advertising, so that the latter could put the material in their salesmen's books. This brochure was put out about one year after Larson started handling Duraladd products, and it is still in use.

The air machine, originally set up with help from the Duraladd representative, is the same as when originally set up, except for retooling that was done under Duraladd's instructions.

Respondent Moore contends that under the facts and circumstances shown by the record in the instant proceeding petitioner Duraladd Products Corporation was doing business in California within the meaning of the applicable code sections. He argues that "in determining whether or not a foreign corporation is subject to service of process in this State, the test is not merely mechanical or quantitative (*International Shoe Co.* v. *Washington, supra* [326 U.S. 310 (66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057)])," and quotes from the recent case of *Jeter* v. *Austin Trailer Equipment Co.*, 122 Cal.App.2d 376, at page 388 [265 P.2d 130], as follows:

"By way of recapitulation of the current state of the law under the evolving concept of the 'doing business' requirement, it is deducible from the cases that the essentials of due process are fully met, at least for the purposes of amenability to local process and jurisdiction, if a foreign corporation maintains substantial contacts with a state through a course of regularly-established and systematic business activity, as distinguished from casual, isolated, or insubstantial contacts or transactions. The court must be astute to weigh the facts of the individual case to determine whether the particular type of activity in, relation to, or nexus with, the forum is of such substance as will make it just and equitable to

conclude that a corporation is 'doing business' in the sense required by the purpose at hand.''

Respondent Moore also cites *Sales Affiliates, Inc.* v. *Superior Court*, 96 Cal.App.2d 134, where the court said at page 136 [214 P.2d 541]:

''. . . There is no need for us to indulge in a repetitious analysis of the authorities. Every factual situation where the question arises calls for a comparison of the business advantages derived from the methods employed by the corporation, with those it would enjoy if it conducted its business through its own offices or paid agents in the state. If the representation which petitioner maintained in the state gave it in a practical sense, and to a substantial degree, the benefits and advantages it would have enjoyed by operating through its own office or paid sales force, it was clearly doing business in the state so as to be amenable to civil process.''

As stated in *Fielding* v. *Superior Court*, 111 Cal. App.2d 490, at pages 494, 496 [244 P.2d 968]:

''. . . The essence of doing business is that the corporation is present within the state sufficiently to constitute it just and equitable that it be amenable to process within the state. (*Milbank* v. *Standard Motor Const. Co.*, 132 Cal.App. 67 [22 P.2d 271]; *Boote's Hatcheries, etc. Co.* v. *Superior Court*, 91 Cal.App.2d 526, 528 [205 P.2d 31].)

.   .   .   .   .   .   .   .   .   .   .   .   .

''In the final analysis it would seem that this is really not a question of the power of the state, but whether there is afforded to both parties a greater amount of justice by allowing suit in this state rather than requiring it elsewhere. (See 20 C.J.S. 148; *International Shoe Co.* v. *Washington*, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057].)''

And as this court said in *Martin Brothers Elec. Co.* v. *Superior Court*, 121 Cal.App.2d 790, at page 793 [264 P.2d 183]:

''Not '*any* activity' of a foreign corporation in the state will make it amenable to process and there is no precise test that can be applied in all cases. It 'is the combination of local activities conducted by such foreign corporation— their manner, extent and character—which becomes determinative of the jurisdictional question.' (*West Pub. Co.* v. *Superior Court*, 20 Cal.2d 720, 728 [128 P.2d 777].) In the language of *Sales Affiliates, Inc.* v. *Superior Court, supra* [96 Cal.App.2d 134 (214 P.2d 541)], it must be shown that

the corporation 'maintained in the state' a representation which 'gave it in a practical sense, and to a substantial degree, the benefits and advantages it would have enjoyed by operating through its own office or paid sales force.' ''

In the instant case we have a situation where the Larson Company was not only an exclusive distributor, but, insofar as it assembled parts into a completed whole, it participated in the final stages of manufacture of Duraladd's products. Such products were purchased outright by the California concern and Duraladd had no financial interest whatever in them from the time of shipment. However, it is apparent that Duraladd maintained a continuous course of business with the California company and continued after the original installation of the assemblly equipment to maintain an interest in seeing that the assembling was done properly; and, also, Duraladd was obviously interested in maintaining the volume of California sales and to that end furnished advertising material. In the agreement between petitioner and Larson Ladder Company it is provided, among other things, that ''It is the intention of the parties listed in the within agreement that Mr. Dodd of the Corporation shall make annual visits to Larson for the purpose of technical consultation.'' Duraladd, at least tacitly, held out Larson Ladder Company as its California distributor or representative.

As stated by the Supreme Court of the United States in *International Shoe Co.* v. *Washington*, 326 U.S. 310, 319 [66 S.Ct. 154, 90 L.Ed. 95, 103-104, 161 A.L.R. 1057]:

''It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. . . .

''But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the

activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue. . . .''

In view of the facts and circumstances of the instant case, as hereinbefore set forth, and bearing in mind the rules laid down in the authorities hereinbefore cited, we are satisfied that the activities of petitioner in this state bring it within the framework of the ''doing business'' concept for the purpose of assumption of jurisdiction and amenability to process, and that there is substantial evidence to support the order denying the motion to quash the service of summons.

The petition for a peremptory writ is denied; and the alternative writ heretofore issued is discharged.

Van Dyke, P. J., and Finley, J. pro tem.,* concurred.

Petitioner's application for a hearing by the Supreme Court was denied August 17, 1955. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.