[No. 29296. *En Banc.* January 4, 1945.]

INTERNATIONAL SHOE COMPANY, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*[1]

[1]Reported in 154 P. (2d) 801.

*Stern & Stern, Allen Orton,* and *T. M. Royce,* for appellant.

*The Attorney General* and *George W. Wilkins, Assistant,* for respondent.

JEFFERS, J.—The proceedings involved in this action were commenced by the department of unemployment compensation and placement, hereinafter referred to as the department, to recover contributions claimed to be due from International Shoe Company, hereinafter referred to as appellant, for the period of January 1, 1937, through December 31, 1941. No contention is made by appellant that the amount of the contributions found to be due by the commissioner of unemployment compensation and placement and the superior court of King county was not correct, if appellant is liable for any contributions.

Notice of assessment was personally served upon Edward S. Alley, a salesman employed by appellant, in King county, Washington, on October 10, 1941. On October 18th, appellant appeared specially before the department and moved to quash the service upon Mr. Alley upon the following grounds: (1) That service of the notice of assessment upon Mr. Alley was not good service on appellant. (2) That appellant is a corporation, organized and existing under and by virtue of the laws of Delaware, and is not engaged in

doing business within the state of Washington; that it has no agent or other person within this state upon whom service of process may be made; that it is doing only interstate business. (3) That appellant is not an employer and does not furnish employment within the state of Washington, within the meaning of those terms as defined by the unemployment compensation act.

Appellant requested a hearing, and pursuant to such request the matter came on for hearing before the appeal tribunal upon stipulated facts, supplemented by the testimony of Edward Alley. On January 25, 1943, the appeal tribunal rendered its decision, wherein it denied appellant's motion to quash and held the commissioner was authorized to recover from appellant for the period above mentioned contributions in the sum of $3,159.24.

A petition was duly filed with the commissioner to review the decision of the appeal tribunal. The commissioner thereafter reviewed such decision, and on February 11, 1943, entered an order confirming the decision of the appeal tribunal.

An appeal was taken from the decision of the commissioner to the superior court for King county, which thereafter, on November 10, 1943, entered judgment affirming the decision of the commissioner. This appeal is from the judgment entered by the superior court, and as a basis for such appeal appellant assigns error upon the finding of the trial court that appellant was doing business in Washington so as to be subject to process; upon the finding that Edward S. Alley had sufficient capacity to represent appellant so that service of process could be made upon him; upon the finding that the commissioner had jurisdiction to levy an assessment for contributions to the unemployment compensation fund; and upon the entry of judgment against appellant.

While we do not believe the testimony of Mr. Alley adds anything to the stipulated facts, we mention his testimony because the record shows the facts to be considered were those stipulated, plus the testimony of Mr. Alley.

The pertinent facts may be stated as follows: Appellant is a Delaware corporation, having its principal place of business in St. Louis, Missouri. Its principal business consists of the manufacture and sale of boots, shoes, and other footwear. It maintains places of business where manufacturing is carried on, and from which its merchandise is sold, in the states of Missouri, Arkansas, Illinois, Kentucky, North Carolina, Pennsylvania, New York, and New Hampshire. Its merchandise is sold in Washington through its several selling divisions or branches, the following branches being the only ones doing any sort of business with residents of the state of Washington: Roberts, Johnson & Rand, Peters, Friedman-Shelby and Specialty. So far as appears from the record, these branches seem to be no more than designated sales units to handle appellant's products.

Appellant has no place of business in this state. It makes no contracts either for sale or purchase in this state. It maintains no stock of merchandise in this state, and makes no deliveries of merchandise in intrastate commerce in this state.

In its business in the state of Washington for four years, 1937 through 1940, appellant employed from eleven to thirteen salesmen, all of whom resided in the state, and whose principal activity was the solicitation of orders for appellant's merchandise to be delivered in this state. Commissions paid to these salesmen for the four years indicate the volume and extent of business carried on by the salesmen for appellant. It is evident that this business did not consist of isolated transactions, but was a continuous course of business, the total commissions paid for 1937 being $36,098.19, for 1938, $32,075.63, for 1939, $33,846.44, and for 1940, $31,879.19, or a total for commissions for the four year period, $133,899.45.

These salesmen are under the direct supervision and control of sales managers, the latter being located in St. Louis. Each salesman has a designated territory within the state. Salesmen have a sample line consisting of one shoe of a pair. These samples belong to appellant and are given to the salesmen to display to prospective purchasers. Some of

the salesmen rent sample rooms in business buildings, and some maintain no permanent sample rooms but rent rooms in hotels or business buildings in the various cities in their territory. The expense of such rental is paid by the salesmen, and they are later reimbursed by appellant. The authority of the salesmen is limited to exhibiting to merchants who are probable buyers samples of merchandise for which they solicit orders, endeavoring to procure orders on prices and terms fixed by appellant. If orders are obtained, the salesmen transmit them to appellant's office in St. Louis for acceptance or rejection. If the orders are accepted by appellant, the merchandise called for by such orders is shipped f. o. b. shipping point, from outside the state of Washington. No salesman has authority to bind appellant with any contract or to finally conclude any transaction in its behalf, nor can he make collections. Salesmen are not permitted to engage in an independently established trade, occupation, profession, or business of the same nature as is involved in their employment by appellant.

The only thing which it can be said Mr. Alley's testimony added to the stipulated facts may be gathered from his somewhat detailed account of the conventions held each year at St. Louis, which the salesmen are required to attend, their expenses being paid by appellant. From this testimony, it appears that a regular program is followed by appellant through this contact with its salesmen, to keep the company's business at a high level; to eliminate, so far as possible, difficulties arising in the particular territories, and to discuss the credit of Washington purchasers and customers with whom appellant is doing business. The company's business in this state is apparently discussed in great detail, and the salesmen are instructed as to the line of shoes they are to offer to the trade, the method of selling, and conditions of selling. They also receive information with reference to construction and new types and kinds of shoes which are to be offered to the trade.

Rem. Supp. 1941, § 9998-114c, provides:

"At any time after the Commissioner shall find that any contribution or the interest thereon have become delin-

quent, the Commissioner may issue a notice of assessment specifying the amount due, which notice of assessment shall be served upon the delinquent employer in the manner prescribed for the service of summons in a civil action, except that if the employer cannot be found within the state, said notice will be deemed served when mailed to the delinquent employer at his last known address by registered mail. . . ."

Rem. Rev. Stat., § 226 [P. C. § 8438], provides the manner of service of summons in civil actions. Subdivision 9 of § 226 provides that, if the suit be against a foreign corporation doing business within this state, the summons shall be served by delivery of a copy thereof to *any agent*, cashier, or secretary thereof.

In the instant case, both methods of service provided for by § 9998-114c, *supra,* were followed.

The principal question with which we are here concerned is whether or not appellant was doing business in the state of Washington so as to make it amenable to process of the courts of this state.

Before discussing some of the authorities dealing with the question last above stated, we desire to call attention to the fact that we shall first consider the specific question of whether or not appellant is so doing business within this state as to make it amenable to process by the courts of this state, and not whether it is so doing business as to require it, in certain instances, to pay the annual license fee required by our statutes, as was the case in *Smith & Co. v. Dickinson,* 81 Wash. 465, 142 Pac. 1133. It is true that in the cited case the court does not point out the distinction above made, but the facts upon which the opinion is based and the statutes cited clearly show that the court was there considering the question of whether or not Smith & Co., a foreign corporation, was so doing business within this state as to require it to plead and prove that it had paid the annual license fee required by the statute before it could bring an action in this state.

We are of the opinion the *Dickinson* case, *supra,* is not contrary to the conclusion we have reached on the question here presented, nor have we been cited to any case decided

by this court which, in our opinion, is contrary to such conclusion, when the distinction above pointed out is kept in mind, a distinction which is clearly made in the leading and often cited case of *Tauza v. Susquehanna Coal Co.*, 220 N. Y. 259, 115 N. E. 915, to which further reference will be made.

We have in several cases stated that the mere bringing of an action in this state by a foreign corporation, does not constitute doing business in this state so as to require such corporation to pay an annual license fee. *Lilly-Brackett Co. v. Sonnemann,* 50 Wash. 487, 97 Pac. 505; *Smith & Co. v. Dickinson,* 81 Wash. 465, 142 Pac. 1133; *Alaska Pac. Nav. Co. v. Southwark Foundry & Machine Co.,* 104 Wash. 346, 176 Pac. 357; *Singmaster v. Hall,* 98 Wash. 134, 167 Pac. 136; *St. Anthony & Dakota Elevator Co. v. Turner,* 132 Wash. 419, 232 Pac. 288; *Procter & Gamble Co. v. King County,* 9 Wn. (2d) 655, 115 P. (2d) 962. In the case last cited, we stated:

"We have consistently held that statutes providing that no corporation shall commence any action in this state without alleging and proving that it has paid its annual license fee, refer only to corporations doing business within this state, and do not apply to a nonresident corporation simply bringing an action in this state, as that does not constitute doing business within this state. *Lilly-Brackett Co. v. Sonnemann,* 50 Wash. 487, 97 Pac. 505; *Smith & Co. v. Dickinson,* 81 Wash. 465, 142 Pac. 1133."

The above-cited cases are not in point from a factual standpoint, nor are they in point when the question to be considered is whether or not the foreign corporation was doing business in this state so as to be amenable to process.

Later in this opinion we shall deal with the question of whether or not the exaction of the payment required under the unemployment compensation act is an unlawful burden upon interstate commerce.

We here also desire to emphasize that in reaching the conclusion drawn on this first question, we have not alone considered the volume of business transacted, but we have considered all the facts stipulated.

We desire first to call attention to an article in volume 35 of Michigan Law Review, under the general heading

"Comments," on page 969. This article states the early theory as expressed by Justice Taney "that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created," and some of the reasons why the several states have passed statutes providing for service of process upon foreign corporations which are "doing business" within the state. The article further states:

"The factor of 'doing business' within a state was not recognized as establishing a new basis for jurisdiction but was explained upon the theory of consent. The reasoning was that since the state had the power to refuse admission of foreign corporations which were not agents of the Federal Government or corporations engaged in interstate commerce, the state could as an implied condition to the corporation's entering the state make a foreign corporation amenable to process there. The corporation's consent to the statutory condition was implied upon its entering the state. Later another theory, called the 'actual presence' theory, was developed. Under this theory it was said that if a corporation was 'doing business' in a state it must be present in that state. The use of these two fictional theories, which extended the law of natural persons to make it adaptable to corporations, is largely responsible for the confusion occurring in this field."

The article further refers to and discusses three leading cases on this question, namely, *Green v. Chicago B. & Q. R. Co.*, 205 U. S. 530, 51 L. Ed. 916, 27 S. Ct. 595, which holds that the corporation was not "doing business" in Pennsylvania, and *International Harvester Co. v. Kentucky*, 234 U. S. 579, 58 L. Ed. 1479, 34 S. Ct. 944, and *Tauza v. Susquehanna Coal Co.*, 220 N. Y. 259, 115 N. E. 915, which hold that the respective corporations were doing business in the state where process was served.

Typical of the early cases based upon the consent theory is *Lafayette Ins. Co. v. French*, 59 U. S. 404, 15 L. Ed. 340.

The corporate presence theory was apparently formulated by Mr. Justice Brandeis in the case of *Philadelphia & Reading R. Co. v. McKibbin*, 243 U. S. 264, 61 L. Ed. 710, 37 S. Ct. 280, in these words:

"A foreign corporation is amenable to process to enforce a personal liability, in the absence of consent, only if it is

doing business within the State in such manner and to such extent as to warrant the inference that it is *present there.*" (Italics ours.)

In *People's Tobacco Co. v. American Tobacco Co.,* 246 U. S. 79, 62 L. Ed. 587, 38 S. Ct. 233, the following general rule was announced:

"The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the State or district where service is attempted."

In *State ex rel. Columbia Broadcasting Co. v. Superior Court,* 1 Wn. (2d) 379, 96 P. (2d) 248, we cited with approval the general rule as above stated, but in view of what was stated in this same case in 5 Wn. (2d) 711, 105 P. (2d) 70, the decision in 1 Wn. (2d) cannot be considered as authority, other than as it expresses the opinion of the judges who signed that opinion.

The leading case on the question of what constitutes doing business within a state by a foreign corporation so as to justify the courts of that state in taking jurisdiction of complaints against it, is *International Harvester Co. v. Kentucky,* 234 U. S. 579, hereinbefore referred to. The case presented the question of the sufficiency of the service of process on an alleged agent of the Harvester Co. in a criminal proceeding in a county court of Kentucky in which an indictment had been returned against the Harvester Co. for an alleged violation of the anti-trust laws of Kentucky. It is conceded in the cited case that whether the person upon whom process was served was one designated by the law of Kentucky as an agent to receive summons on behalf of the company, was a question within the province of the court of appeals of Kentucky to finally determine. The court stated the first question to be determined was whether, under the circumstances shown in that case, the Harvester Co. was carrying on business in Kentucky in such a manner as to justify the courts of that state in taking jurisdiction of complaints against it. The opinion states:

"For some purposes a corporation is deemed to be a resident of the State of its creation, but when a corporation of one State goes into another in order to be regarded as within the latter it must be there by its agents authorized to transact its business in that State. The mere presence of an agent upon personal affairs does not carry the corporation into the Foreign State. It has been frequently held by this court, and it can no longer be doubted that it is essential to the rendition of a personal judgment that the corporation be 'doing business' within the State. . . . each case must depend upon its own facts, and their consideration must show that this essential requirement of jurisdiction has been complied with and that the corporation is actually doing business within the State."

The facts upon which the court determined that the corporation was doing business in Kentucky were as follows:

" 'Travelers negotiating sales must not hereafter have any headquarters or place of business in that State, but may reside there.

" 'Their authority must be limited to taking orders, and all orders must be taken subject to the approval of the general agent outside of the State, and all goods must be shipped from outside of the State after the orders have been approved. Travelers do not have authority to make a contract of any kind in the State of Kentucky. They merely take orders to be submitted to the general agent. If any one in Kentucky owes the Company a debt, *they may receive the money, or a check, or a draft for the same* but they do not have any authority to make any allowance or compromise any disputed claims. . . . All contracts of sale must be made f. o. b. from some point outside of Kentucky and the goods become the property of the purchaser when they are delivered to the carrier outside of the State. Notes for the purchase price may be taken and they may be made payable at any bank in Kentucky. All contracts of any and every kind made with the people of Kentucky must be made outside of that State, and they will be contracts governed by the laws of the various States in which we have general agencies handling interstate business with the people of Kentucky.' " (Italics ours.)

The opinion states:

"Upon this question the case is a close one, but upon the whole we agree with the conclusion reached by the Court of Appeals, that the Harvester Company was engaged in

carrying on business in Kentucky. We place no stress upon the fact that the Harvester Company had previously been engaged in doing business in Kentucky and had withdrawn from that State for reasons of its own. . . . *Here was a continuous course of business in the solicitation of orders which were sent to another State and in response to which the machines of the Harvester Company were delivered within the State of Kentucky. This was a course of business, not a single transaction.* The agents not only solicited such orders in Kentucky, but might there receive payment in money, checks or drafts. They might take notes of customers, which notes were made payable, and doubtless were collected, at any bank in Kentucky. This course of conduct of authorized agents within the State in our judgment constituted a doing of business there in such wise that the Harvester Company might be fairly said to have been there, doing business, and amenable to the process of the courts of the State." (Italics ours.)

We call attention at this point to the fact that while in the cited case the court stated the agents might receive payment in money, checks, or drafts, and might take notes of customers, payable at Kentucky banks, the court did not emphasize these latter facts in holding that the company was carrying on a *continuous course of business*.

The cited case distinguishes the case of *Green v. Chicago, B. & Q. R. Co.*, 205 U. S. 530, 51 L. Ed. 916, 27 S. Ct. 595, often cited to sustain the contention that a foreign corporation is not doing business within a state where it appears that in substance such business consisted of nothing more than the solicitation of orders.

Some three years after the decision in the *International Harvester Co.* case, *supra*, Mr. Justice Day, who wrote the opinion in that case, wrote the opinion in the case of *People's Tobacco Co. v. American Tobacco Co.*, 246 U. S. 79, *supra*. While we are of the opinion, from an examination of the cited case, that the decision might well have been sustained upon the theory that the authority of Irby, the agent of American Tobacco Co. upon whom service was attempted to be made, had been revoked prior to the time of such attempted service, yet the court, as disclosed by the opinion, did state that the American Tobacco Co. was sell-

ing goods in Louisiana to jobbers and sending its drummers into that state to solicit orders from the retail trade, to be turned over to the jobbers, the charges being made by the jobbers to the retailers. These agents were not domiciled in the state and did not have the right or authority to make sales on account of the defendant company, collect money, or extend credit for it. The court, after the statement here-inabove referred to relative to the attempted service on an unauthorized agent, further states:

"Upon the broader question, we agree with the District Court that the American Tobacco Company at the time of the attempted service was not doing business within the State of Louisiana. The question as to what constitutes the doing of business in such wise as to make the corpora-tion subject to service of process has been frequently dis-cussed in the opinions of this court, and we shall enter upon no amplification of what has been said. Each case depends upon its own facts. The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corpora-tion has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the State or district where service is attempted. . . .

"As to the continued practice of advertising its wares in Louisiana, and sending its soliciting agents into that State, as above detailed, the agents having no authority beyond solicitation, we think the previous decisions of this court have settled the law to be that such practices did not amount to that doing of business which subjects the corporation to the local jurisdiction for the purpose of service of process upon it."

The court, after referring to the *International Harvester* case, *supra,* held that the district court properly concluded that the attempted service on Irby should be quashed.

From the cited cases, we reach the conclusion that, while mere solicitation of business within a state by the agents of a foreign corporation does not constitute doing business so as to make the corporation amenable to process by the courts of that state, solicitation, together with certain other acts, will be sufficient to render the corporation subject to process. So our inquiry now is: What additional acts will be deemed sufficient for this purpose?

In 1917, Justice Cardozo (then judge of the New York court) wrote the often cited opinion in the case of *Tauza v. Susquehanna Coal Co.*, 220 N. Y. 259, 115 N. E. 915. The court sums up the facts in the cited case in the following words:

"In brief, the defendant maintains an office in this state under the direction of·a sales agent, with eight salesmen, and with clerical assistants, and through these agencies systematically and regularly solicits and obtains orders which result in continuous shipments from Pennsylvania to New York.

"To do these things is to do business within this state in such a sense and in such a degree as to subject the corporation doing them to the jurisdiction of our courts."

It might be added that all orders secured through the New York office were subject to confirmation at the home office in Pennsylvania. No person connected with the New York office had authority to receive payment for shipments of coal, or to receive or endorse checks. At the conclusion of a discussion of the *International Harvester* case, *supra,* the court stated:

"That case goes farther than we need to go to sustain the service here. It distinguishes *Green v. Chicago, B. & Q. Ry. Co.* (205 U. S. 530) where an agent in Pennsylvania solicited orders for railroad tickets which were sold, delivered and used in Illinois. *The orders did not result in a continuous course of shipments from Illinois to Pennsylvania. The activities of the ticket agent in Pennsylvania brought nothing into that state.* In the case at bar, as in the *International Harvester* case, there has been a steady course of shipments from one state into the other. The business done in New York may be interstate business, but business it surely is." (Italics ours.)

The court further stated:

"In construing statutes which license foreign corporations to do business within our borders we are to avoid unlawful interference· by the state with interstate commerce. The question in such cases *is not merely whether the corporation is here,* but *whether its activities are so related to interstate commerce that it may, by a denial of a license, be prevented from being here. . . .* If in fact it is here, if it is here, not occasionally or casually, but with

a fair measure of permanence and continuity, *then, whether its business is interstate or local,* it is within the *jurisdiction of our courts . . . The nature and extent of business contemplated by licensing statutes is one thing. The nature and extent of business requisite to satisfy the rules of private international law may be quite another thing. . . .* Unless a foreign corporation is engaged in business within the state, it is not brought within the state by the presence of its agents. But there is no precise test of the nature or extent of the business that must be done. *All that is requisite is that enough be done to enable us to say that the corporation is here.*" (Italics ours.)

The holding in the *Tauza* case may be boiled down to this: That where there is a systematic and regular solicitation of orders by an agent or agents of the corporation, resulting in a continuous shipment of goods into the state where the agents are operating, together with the maintenance of a permanent office in the state by the corporation, the corporation can be said to be doing business in that state so as to make it amenable to process by the courts of such state.

The cases dealing with the question here presented are multitudinous. While it is probably true that most of the cases which hold the corporation was doing business in the state so as to make it *amenable to process* have some slight activity on the part of the agent in addition to the solicitation of orders resulting in a continuous flow of the corporation's products into the state, yet it seems to us the basic fact upon which the courts have determined that the corporation was doing business was the regular and systematic solicitation of orders by the agent, resulting in the continuous flow of the corporation's products into the state by means of interstate carriers.

The following are typical cases holding that the corporation was doing business in the state where service was attempted to be made. From our discussion of these cases will appear what facts, in addition to mere solicitation, the courts considered in determining that the corporation was doing business in the state. It will also appear from some of the decisions that a regular and systematic course of solicitation of orders by the agent of the corporation, result-

ing in a continuous flow of the corporation's products into the state, should be and is sufficient to warrant the court in holding the corporation was doing business in the state. Many of these cases cite and rely upon the *International Harvester* case. *Lamont v. Moss Cigar Co.*, 218 Ill. App. 435; *Hormel & Co. v. Ackman*, 117 Fla. 419, 158 So. 171, where in addition to soliciting orders the agent made some collections; *Wheeler v. Boyer Fire Apparatus Co.*, 63 N. D. 403, 248 N. W. 521, where the agent's authority consisted in soliciting orders and making collections (this case refers to and quotes from the *International Harvester* case, *supra*, *Tauza v. Susquehanna Coal Co.*, *supra*, and *American Asphalt Roof Corp. v. Shankland*, 205 Iowa 862, 219 N. W. 28, ·of which more will be said later); *Dobson v. Maytag Sales Corp.*, 292 Mich. 107, 290 N. W. 346; *International Shoe Co. v. Lovejoy*, 219 Iowa 204, 257 N. W. 576, wherein the court stated:

"It appears from the foregoing recital of the facts that, in addition to the solicitation of orders from customers for shoes, Sommerhauser sought to induce Buttenhoff and others to engage in the shoe business. This appears to have been a part of his duties as a salesman. He was authorized to receive checks in payment of accounts and to transmit the same to petitioner, but not to cash the same or to receive money. Petitioner did not, in a general sense at least, maintain an office or place of business in this state. It did, however, permanently maintain a sample or display room in a hotel in Des Moines which was visited by actual or prospective customers to whom sales of merchandise were made. This method of transacting the business amounted to something more than the mere solicitation of orders. The practice of aiding, if not inducing, others to establish stores and engage in the shoe business in this state also amounted to more than the mere solicitation of orders."

In the case of *American Asphalt Roof Corp. v. Shankland*, 205 Iowa 862, 219 N. W. 28, hereinbefore referred to, the defendant was a foreign corporation having its principal place of business in Kansas City, Missouri. The agent on whom service was made was a traveling salesman, with authority to solicit orders which were forwarded to the home office for acceptance. *He had no authority to accept*

*orders, make contracts, receive payment of any kind, and maintained no office or permanent place of business within the state of Iowa.* The defendant furnished him with an automobile and paid the expenses of its operation. The agent resided in Des Moines and frequently sought retail customers to patronize the dealers to whom he made sales. The court, in reaching its decision that the corporation was doing business in Iowa, relied principally upon the *Tauza* and the *International Harvester* cases, *supra.* After quoting from the latter case, the court stated:

"The continuous course of business referred to was *the solicitation of orders, which were sent to another state, and in response to which the machines of the Harvester Company were delivered within the state of Kentucky.* The court said, 'This was a course of business,—not a single transaction.' It is true that the above language is followed by a reference to the fact that the agents were authorized to receive notes, drafts, checks, money, etc., and transmit the same to the Harvester Company. Such transactions were, however, merely formal acts, and involved the exercise of no discretion on the part of the agent, and were always referable to transactions closed by the approval of the order, and, no doubt, generally by the delivery of the machines. *These transactions are not given significance in what the court terms a continuous course of business.''* (Italics ours.)

It is apparent that the Iowa court was of the opinion the court in the *International Harvester* case attached no particular importance to the fact that the agent was authorized to receive notes, checks, drafts, etc. This is evident from the concluding words in the opinion of the *Shankland* case:

"We recognize that the question is by no means free from difficulty; but it seems to us that the facts disclosed by the record establish that petitioner was, and has been for many years, engaged in a *systematic and continuous course of business in the solicitation of orders* and the delivery and shipment of merchandise to numerous customers, new and long established, and that such conduct constitutes doing business in this state within the meaning of that term as used in Section 11072 and as construed and interpreted by the decisions of the Supreme Court of the United States. If

the corporation was doing business in this state, it will hardly be questioned that Killingsworth [the agent] was a proper person upon whom service might be had." (Italics ours.)

The case of *West Pub. Co. v. Superior Court,* 20 Cal. (2d) 720, 128 P. (2d) 777, is, in our opinion, a well-considered case. Many cases are cited, among them *Green v. Chicago, B. & Q. R. Co., supra,* and *People's Tobacco Co.. v. American Tobacco Co., supra,* often cited to sustain the contention that a foreign corporation is not doing business in the state where service of process was attempted to be made. It also cites, and to a great extent relies on, the *Tauza* and *International Harvester* cases, *supra,* and recognizes that the adjudicated cases since the *International Harvester* decision have not been in complete agreement as to the precise factors additional to *mere solicitation* which motivated the court in the *Harvester* case to sustain the jurisdiction of the Kentucky court. The case goes on to say that, while the decision in *People's Tobacco Co. v. American Tobacco Co., supra,* seems to have stressed the fact that the agents in the *Harvester* case were authorized to receive payments in Kentucky, other leading authorities have viewed the *quantity* and *continuity* of the solicitation of business in Kentucky as the controlling factor of the decision, rather than the mere additional circumstances of collecting money; citing, as sustaining this latter theory, *Tauza v. Susquehanna Coal Co., supra,* and *American Asphalt Roof Corp. v. Shankland, supra.*

A good discussion of the question here presented will be found in *Dahl v. Collette,* 202 Minn. 544, 279 N. W. 561, where practically all the leading cases decided up to that time (April, 1938) are cited and discussed. We quote from the cited case:

"Courts are agreed that solicitation, if the only evidence of the visitation of a foreign corporation, will not warrant a finding that the corporation is doing business so as to be subject to process. [Citing among other authority *Green v. C. B. & Q. Ry., supra.*] This is not to say that solicitation, regularly and systematically conducted, within the jurisdiction is without import in deciding whether the cor-

poration is doing business therein. Its simple meaning is that solicitation alone without other corroborating circumstances is not of sufficient strength to sustain the inference that the corporation is present. . . . Solicitation aided by further manifestations of corporate presence no one of which is singly capable of carrying the weight of the inference will warrant the conclusion that it is doing business here. . . .

"Solicitation in regular course of business, together with acceptance and performance of the contract within the state, will give ample ground for the conclusion of corporate presence. . . . Or if the solicitation results in a continuous flow of goods into the state and if payment therefor is made within the state, these factors altogether support the inference that the corporation is present doing business. . . . *It has also been held that if regular and systematic solicitation concurs with a continuous flow of goods into the state the inference is permissible.* . . . Solicitation joined with adjustment of complaints as a part of the ordinary course of business also sustains the inference. . . . The substance of the cases seems to be that although the rule against the sufficiency of solicitation alone still persists, 'it readily yields to *slight additions.*' " (Italics ours.)

The court then states that the facts show that:

"There was the solicitation of orders, which although not incessant in the sense that it was being conducted here at all times, yet was regular and systematic rather than incidental and haphazard. The volume of its products coming into the state as the direct result of this solicitation, while perhaps inconsiderable in relation to the total of its national business, was nevertheless substantial. The flow of its manufactures into the state appears to have been constant and continuous. The compromise and adjustment of disputes with its customers appears also to have been habitually carried on here. Added to these circumstances is the fact of the maintenance of display and demonstration rooms at conventions attended by present and prospective customers under the management of an officer or agent of appellant. This occurrence is not of great weight, neither is it quite without significance. . . .

"While it may be admitted that no one of the factors relied upon by respondents to demonstrate the corporate presence within the state of appellant is capable of sustaining that inference, and while the courts in some instances, as has been pointed out, are divided as to the sufficiency of

any two of them, we are confident that their cumulative strength is ample to support the conclusion we reach that appellant was doing business and was therefore present within this state at the time service of the summonses and complaints was made on Collette as its agent."

The Wisconsin court in *In re Petition of Northfield Iron Co.*, 226 Wis. 487, 277 N. W. 168, places the same interpretation upon the *International Harvester* case as did the Iowa court in the *Shankland* case and the New York court in the *Tauza* case, saying:

"It is our conclusion that so far as the question of state power is concerned, the *International Harvester Co.* case, *supra,* must be taken to make valid a statute by a state providing for service upon the soliciting agent of a foreign corporation whose only activity aside from a solicitation of orders within the state is the filling of these orders through the instrumentality of interstate commerce."

In the case of *Harbich v. Hamilton-Brown Shoe Co.*, 1 F. Supp. 63, the Federal district court for the southern district of Texas had before it a set of facts very much like those in the instant case. In the cited case, service was made upon one Dan Smith, a salesman for the shoe company in the state of Texas. So far as the opinion indicates, Dan Smith had authority only to solicit orders, which he did in a regular and systematic way by appearing at customer's stores and offering samples for the customer's inspection. Smith had no authority on behalf of the shoe company to sell merchandise or otherwise bind the shoe company, but was solely a *soliciting agent*. The orders were taken subject to acceptance by the shoe company at its home office in St. Louis, Missouri. When the orders were accepted, the goods were shipped from outside the state of Texas in interstate commerce. The court held the shoe company was doing business in Texas, and that service on Smith was sufficient service on the company.

A very recent Federal case dealing with this question is *Frene v. Louisville Cement Co.*, 77 U. S. App. D. C. 129, 134 F. (2d) 511, decided January 25, 1943. In the cited case, the defendant Cement Co. was a Kentucky corporation, having its principal place of business at Louisville, Kentucky. It

maintained no office or place of business in the District of Columbia. Its business was the manufacture and sale of cement and cement products. Lovewell, the agent upon whom service was had, resided in a suburb of Washington. His telephone number, which was displayed, together with his home address, his name and that of defendant, upon his business card, was listed in the Washington directory. Lovewell had authority to solicit orders for defendant's products, and his territory comprised all of Maryland, except the two western counties, the District of Columbia, and the eastern part of Virginia. He spent two thirds or three fourths of his time in Washington, which he said was "the biggest market in my territory." The volume of business done in Washington was large. Lovewell had no authority to conclude contracts or make binding sales. When he received orders, he forwarded them to the home office in Louisville, where they were accepted or rejected. Shipments on orders accepted were made in interstate commerce to building supply dealers in the vicinity of the job, who in turn supplied them to the contractors. Lovewell frequently visited jobs in course of construction where defendant's products were being used, and on these occasions he would note the manner in which the products were being installed or used, and if any difficulties were being experienced, he would make suggestions as to how to overcome them. He would also go over any complaints and report them to the home office, but he had no authority to finally make adjustments or compromises. We quote from the opinion, which was written by Justice Rutledge, and which we think contains a sound criticism of the solicitation rule:

"The tradition has grown that personal jurisdiction of a foreign corporation cannot be acquired when the only basis is 'mere solicitation' of business within the borders of the forum's sovereignty. And this is true, whether the solicitation is only casual or occasional or is regular, continuous and long continued.

"The tradition crystallized when it was thought that nothing less than concluding contracts could constitute 'doing business' by foreign corporations, an idea now well

exploded. It is now recognized that maintaining many kinds of regular business activity constitutes 'doing business' in the jurisdictional sense, notwithstanding they do not involve concluding contracts. In other words, *the fundamental principle underlying the 'doing business' concept seems to be the maintenance within the jurisdiction of a regular, continuous course of business activities, whether or not this includes the final stage of contracting.* . . .

"Furthermore, since the tradition crystallized, other developments in the law of personal jurisdiction have cast doubt upon its validity. These in general have expanded the scope of jurisdictional power over the persons of nonresidents, including foreign corporations. It is still true, generally speaking, that mere casual and occasional acts do not furnish a sufficient basis for assertion of jurisdiction of the person in cases of nonresidents. But the nonresident motorists' statutes, which are applicable to foreign corporations, and the fact they have been so widely enacted and sustained, show two things among others. The first, like the cases sustaining jurisdiction upon a basis of 'solicitation plus,' is that contracting, casually or continuously, is not essential for jurisdictional purposes, nor is negotiation, solicitation, or other activity looking toward the formation of contracts. The second is that some casual or even single acts done within the borders of the sovereignty may confer power to acquire jurisdiction of the person, provided there is also reasonable provision for giving notice of the suit in accordance with minimal due process requirements. . . . In general the trend has been toward a wider assertion of power over nonresidents and foreign corporations than was considered permissible when the tradition about 'mere solicitation' grew up.

". . . But when . jurisdiction has been extended to include some types or kinds of occasional acts and nearly all kinds of continuous operations, the rule which nullifies judicial power when a foreign corporation engages continuously and regularly in 'mere solicitation' is, to say the least, anomalous. . . . *Solicitation is the foundation of sales.* Completing the contract often is a mere formality when the stage of 'selling' the customer has been passed. No business man would regard 'selling,' the 'taking of orders,' 'solicitation' as not 'doing business.' *The merchant or manufacturer considers these things the heart of business.* It is perfectly possible, under the 'mere solicitation' rule, for a foreign corporation to confine its entire market to a single

jurisdiction, yet by carefully limiting its activities there to the soliciting phase, to force each of its customers having cause for legal redress to seek it in the foreign forum of incorporation. By careful segregation of the 'selling' phase in the place of market, a substantially complete immunity to liability, in the practical sense, could be created.

"It would seem, therefore, that the 'mere solicitation' rule should be abandoned when the soliciting activity is a *regular, continuous and sustained course of business,* as it is in this case. It constitutes, in the practical sense, both 'doing business' and 'transacting business,' and should do so in the legal sense. Although the rule has not been clearly and expressly repudiated by the supreme court, its integrity has been much impaired by the decisions which sustain jurisdictions when *very little more* than 'mere solicitation' is done." (Italics ours.)

While it is apparent that the court was of the opinion that the mere solicitation rule should be abandoned when the soliciting activity is a *regular, continuous, and sustained course of business,* the court did not deem it necessary "to take the final step in repudiation in this case, since the facts are sufficient to bring it within the 'solicitation plus' rule."

Justice Edgerton, in a concurring opinion in the cited case, stated:

"It has been suggested that 'the existence of a jurisdiction to determine the personal liability of a corporation . . . depends on the reasonableness of its exercise' and that 'if a foreign corporation voluntarily does business within the state it is bound by reasonable regulations of that business imposed by the state . . . because it is as reasonable and just to subject the corporation to those regulations as though it had consented.' In the normal course of business appellee's agent induced appellants, in the District, to buy its product. They bought it in the District, for use in the District, from a District dealer to whom appellee had sold it. They used it in the District. The alleged defect appeared there and the alleged cause of action presumably arose there. Appellants appear to reside there. I think it is reasonable and just that they should be allowed to enforce their claim there."

We find a statement by this court in the case of *Macario v. Alaska Gastineau Mining Co.,* 96 Wash. 458, 165 Pac. 73, quite in accord with the view expressed by Justice Edgerton:

"We think an examination of the authorities will show that the place of the arising of the cause of action has been generally regarded as of controlling force by the courts in determining the question of a defendant foreign corporation being subject to the process of the court wherein recovery is sought, whenever the question of such foreign corporation doing business generally in the state in which it is sought to be sued is one of doubt."

In the case of *Grams v. Idaho Nat. Harvester Co.*, 105 Wash. 602, 178 Pac. 815, the court held that the defendant, an Idaho corporation, was doing business in this state and was amenable to process of the courts of this state. In addition to selling combined harvesting machines in this state, the company kept on hand, in a warehouse in this state, a large quantity of repair parts for the machines. Many of these articles were sold by the warehouse company as the property of the Harvester Co., the former accounting to the latter for all sales made.

In the case of *State ex rel. Kerr Glass Mfg. Corp. v. Superior Court*, 166 Wash. 41, 6 P. (2d) 368, we held that the solicitation of orders in this state by one Huch, a resident of this state, coupled with the fact that the Glass Co., a Nevada corporation, kept some of its goods in storage in this state, constituted doing business. Huch had no authority to accept orders, but all of the orders were taken subject to approval by the Glass Co. at its home office in Oklahoma. The Glass Co. completed delivery when the products were turned over to the transportation company in Oklahoma. Bills of lading, invoices, and statements were sent from the Glass Co. direct to the buyer. Remittances were made direct from buyer to seller. Huch made no collections and had nothing to do with extending credit.

Summing up the facts in the instant case, we find that the salesmen are all residents of the state of Washington, and have definitely defined territory assigned to them. There is no storage or warehousing of goods. The activities of these agents of appellant consist of the solicitation of orders and the display of samples, sometimes in permanent display rooms. Salesmen are required to spend certain time each year in St. Louis for the purpose of receiving direct

personal instructions as to their duty, as to the line of shoes which they are to offer to the trade, the method of selling, and information with reference to the construction of new types and kinds of shoes which are to be offered to the trade. Some of the salesmen rent sample rooms in business buildings, and the expense of such rental and maintenance is paid by the salesmen, who are reimbursed on an expense account by appellant. There is a detailed program followed by the company through contact with the salesmen, to keep the company's business at a high level, to eliminate differences arising in the particular territory, and to discuss credit of Washington purchasers and customers with whom the company is doing business. As a result of the activities of these agents, there is a continuous flow of appellant's product into this state by means of interstate carriers. This course of action has been carried on over a period of years, by as many as thirteen salesmen, and the substantial volume of merchandise and the regularity of its shipment are clearly shown by the amount of commissions regularly earned by these resident salesmen.

In the case of *Bankers' Holding Corp. v. Maybury*, 161 Wash. 681, 297 Pac. 740, this court adopted the following definition of business, as stated in *Flint v. Stone Tracy Co.*, 220 U. S. 107, 55 L. Ed. 389, 31 S. Ct. 342:

" ' "Business" is a very comprehensive term, and embraces everything about which a person can be employed. . . . "That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." ' "

It seems to us, after a consideration of the facts in this case and the authorities bearing on the question here presented, that the conclusion that appellant, through its agents, was doing business in this state so as to make it amenable to process, is inescapable, whether we follow the "corporate presence theory" or base our decision on the reasonableness of permitting the corporation to be sued in this state rather than forcing respondent to go to Missouri or Delaware to bring its action.

While we are of the opinion that the regular and systematic solicitation of orders in this state by appellant's agents,

resulting in a continuous flow of appellant's product into this state by means of interstate carrier, is sufficient to constitute doing business in this state so as to make appellant amenable to process of the courts of this state, we are also of the opinion that there are additional activities shown which bring this case well within the solicitation plus rule.

On this question, appellant cites and relies on *State ex rel. Paraffine Companies v. Wright,* 184 Wash. 69, 49 P. (2d) 929, and *Bank of America v. Whitney Bank,* 261 U. S. 171, 67 L. Ed. 594, 43 S. Ct. 311. In the former case, the cause came before this court on an application for a writ of mandate to compel the Thurston county superior court to transfer the cause to King county. The application of the Paraffine Co. was based upon the claim that it transacted no business in Thurston county, had no office there, and that there was no person residing in Thurston county upon whom process against it could be served. It appears that there was no person or company in Thurston county having the relationship of agent to the Paraffine Co. All purchases made by Olympia customers of the company were made at the Seattle office, where the principal place of business of the company was located. The customers of the Paraffine Co. in Olympia handling its products did so as independent merchants, and not as agents. The case is not in point.

The factual situation in the second case above cited is so different from that in the instant case that it cannot be considered helpful herein.

The second assignment of error in the case at bar is that Mr. Alley, upon whom service was made, was not such an agent as is contemplated by Rem. Rev. Stat., § 226 [P. C. § 8438]. In view of the conclusion reached by us on the first question presented, we are of the opinion this question can be briefly disposed of.

The entire business of appellant in the state of Washington was carried on by Mr. Alley and other agents having like authority. Subsection 9 of § 226 states that if the suit be against a foreign corporation doing business within this state, service may be made on "any agent."

We stated in *Barrett Mfg. Co. v. Kennedy,* 73 Wash. 503, 131 Pac. 1161, that:

"The words of the statute 'any agent' were intended to have a broad meaning, and must be liberally construed to effectuate the legislative intent. While they may not include a day laborer or an employee who has no authority to represent the corporation in any way other than to discharge his daily task, they must be held to include all such agents as represent the corporation in either a *general* or a *limited* capacity." (Italics ours.)

See, also, *Pacific Typesetting Co. v. International Typographical Union,* 125 Wash. 273, 216 Pac. 358.

It is interesting to note, in view of what we have said on the first question and in the consideration of the second, that in the last-cited case we quoted with approval the following statement found in *Beach v. Kerr Turbine Co.,* 243 Fed. 706:

" 'The tendency of legislation and of judicial decisions is and has been to make it easy to obtain jurisdiction of foreign corporations. As was said by Mr. Justice Gray in *Barrow Steamship Co. v. Kane,* 170 U. S. 100, . . . "The constant tendency of judicial decisions in modern times has been in the direction of putting corporations upon the same footing as natural persons in regard to the jurisdiction of suits by or against them." ' "

On this question, we desire to again call attention to the following statement found in the case of *Tauza v. Susquehanna Coal Co., supra:*

"It is not necessary to show that express authority to accept service was given to the defendant's agent. His appointment to act as agent within the state carried with it implied authority to exercise the powers which under our laws attach to his position. . . . When a foreign corporation comes into this state, the legislature, by virtue of its control over the law of remedies, may define the agents of the corporation on whom process may be served. . . . If the persons named are true agents, and if their positions are such as to lead to a just presumption that notice to them will be notice to the principal, the corporation must submit. . . . The corporation is here; it is here in the person of an agent of its own selection; and service upon him is service upon his principal."

We do not deem further citation of authority necessary. We are of the opinion appellant's second assignment is without merit.

The remaining question is whether or not the imposition upon appellant of liability for contributions to the Washington unemployment compensation fund is an unconstitutional burden upon interstate commerce.

We stated in *Bates v. McLeod*, 11 Wn. (2d) 648, 120 P. (2d) 472, that the contributions exacted under the unemployment compensation act constituted an excise tax upon the privilege of employing others. Employment is defined by Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (g) (1), as follows:

" 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied."

It would seem that the act clearly contemplates that contributions shall be paid into the unemployment compensation fund for such employment as we have in this case. Assuming that appellant is engaged in interstate commerce by reason of the fact that its agents take orders in this state for goods to be shipped from another state, yet we are of the opinion that the contributions exacted by the unemployment compensation act from appellant do not constitute an unlawful burden on interstate commerce. Probably to meet such an argument as is made by appellant herein, and to permit the unemployment compensation acts of the several states to cover the largest possible range of employees, Congress passed the following statute:

"No person required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate or foreign commerce, or that the State law does not distinguish between employees engaged in interstate or foreign commerce and those engaged in intrastate commerce." 26 U. S. C., § 1606 (a).

Appellant contends that it is not required, under the state law, to make payments to the unemployment fund.

We see no merit in this contention. Appellant is a foreign corporation having in its employ for several years more than eight individuals in each of twenty different weeks, performing services for it within this state, and so, under the plain terms of the act, is required to make contributions to the unemployment compensation fund.

We are of the opinion Congress meant just what it said in the above-quoted statute, and that appellant's objection to payment of contributions on this ground is not tenable. But even without the act of Congress above set out, we do not think appellant could avoid liability upon this ground. The cases cited by appellant are cases dealing with taxes imposed on doing business, and the imposition of such taxes on corporations doing business in interstate commerce would clearly tend to burden that commerce.

This court pointed out the distinction between such cases (tax on engaging or continuing within this state in any business) and the instant case, in *Paramount Pictures Dist. Co. v. Henneford,* 184 Wash. 376, 51 P. (2d) 385, where the court stated:

"It being an excise tax for the purpose of raising revenue, the act of the legislature imposing it was not passed in the exercise of the police power. Whether a law is enacted in the exercise of that power, depends upon whether the primary purpose is to raise revenue or to regulate industry."

In the instant case, the act under consideration was passed in the exercise of the police power for the purpose of relieving distress in this state resulting from involuntary unemployment.

In the case of *United Fruit Co. v. Department of Labor & Industry,* 344 Pa. 172, 25 A. (2d) 171, the Pennsylvania court held that the fruit company, engaged wholly in foreign commerce, with its principal office in Boston, but employing about three hundred persons within the state of Pennsylvania, was subject to the workmen's compensation act of Pennsylvania, although it required no authority from that state to carry on its business. The court then stated:

"The fact that an employe working within the State of Pennsylvania is engaged in interstate or foreign commerce does not necessarily take him outside the range of the Workmen's Compensation Act, which applies . . . 'to all accidents occurring within this Commonwealth.' It is well settled that, in the absence of federal legislation on the subject, a state may, without violating the commerce clause of the federal constitution, legislate concerning relative rights and duties of employers and employes while within its borders, although engaged in interstate commerce."

This view was sanctioned by the United States supreme court in *Valley S. S. Co. v. Wattawa*, 244 U. S. 202, 61 L. Ed. 1084, 37 S. Ct. 523. In the cited case, the steamship company was engaged in interstate commerce and contended that it was not liable under the Ohio workmen's compensation act. Answering this contention, Mr. Justice McReynolds, speaking for the court, said:

"We are asked to reverse the action of the Court of Appeals upon two grounds. First, because the company was engaged in interstate commerce and therefore could not be subjected to the Compensation Act without burdening such commerce contrary to the Commerce Clause of the Federal Constitution. . . .

"The first point relied upon is entirely without merit and inadequate to support our jurisdiction. In the absence of congressional legislation the settled general rule is that without violating the Commerce Clause the States may legislate concerning relative rights and duties of employers and employees while within their borders although engaged in interstate commerce."

In conclusion, we are of the opinion the unemployment compensation act does not impose a burden upon interstate commerce, in so far as the business of appellant is concerned.

The judgment of the trial court is affirmed.

BEALS, STEINERT, BLAKE, ROBINSON, MALLERY, and GRADY, JJ., concur.

SIMPSON, C. J. (dissenting)—As a member of this court, I feel impelled by a strong sense of duty to dissent from the able opinion prepared by the majority. I write this dissent prior to completion of its circulation among my

fellow judges. I write it with a sincere hope that I may change the views of the writer and convince all of the judges that the majority opinion as now written is incorrect.

This case comes to us upon an agreed statement of facts, which reads:

"International Shoe Company is a Delaware Corporation. It has its principal place of business in the City of St. Louis, Missouri. Its principal business consists of manufacture and sale of boots, shoes and other footwear. It maintains places of business where manufacturing is carried on and from which its merchandise is sold in the states of Missouri, Arkansas, Illinois, Kentucky, North Carolina, Pennsylvania, New York and New Hampshire. Its merchandise is sold through its several selling divisions or branches, the following branches being the only ones doing any sort of business with residents of the State of Washington:

"Roberts, Johnson & Rand
Peters
Friedmann-Shelby
Specialty

"It has not a place of business in the State of Washington; maintains no general agent in the State of Washington. It makes no contracts, either of sale or of purchase in the State of Washington. It maintains no stock of merchandise in the State of Washington and makes no deliveries of merchandise in intra state commerce in the State of Washington. . . .

"The manner in which the business of International Shoe Company is carried on in the State of Washington, is generally as follows:

"Salesmen are employed from the head office at St. Louis and work under the direct supervision and control of sales managers with offices in St. Louis, and are required as part of their duties to spend certain time each year in St. Louis, Missouri for the purpose of receiving direct personal instructions as to their duties, as to the line of shoes which they are to offer to the trade, the methods of selling, conditions of selling, and to receive information with reference to construction and new types and kinds of shoes which are to be offered to the trade. Said employees or salesmen are given a sample line, which samples uniformly consist of only one shoe of a pair, and no sales are made by salesmen from such samples. They are merely used to display to prospective purchasers. Some of the salesmen rent sample rooms in business buildings and the expenses of such rental

and maintenance is paid by the salesmen and they are reimbursed on an expense account by the International Shoe Company. Other salesmen maintain no permanent sample rooms, but rent rooms in hotels or business buildings in the various cities to which they travel.

"Such transactions as the International Shoe Company has with persons in business, or who reside in the State of Washington, involving the sale and distribution of its merchandise to merchants in the State of Washington and are conducted as follows:

"Each salesman is given a designated territory in which to solicit orders. The authority of the salesman is limited to exhibiting samples of the merchandise for which they solicit orders to merchants who are probable buyers thereof; endeavor to procure orders on prices and terms fixed by the International Shoe Company. If orders are obtained, to transmit them to the office of the International Shoe Company outside the State of Washington for acceptance or rejection, and if orders are accepted by the International Shoe Company the merchandise called for by such orders is shipped F. O. B., shipping point, from outside of the State of Washington. Practically all merchandise shipped by International Shoe Company into the State of Washington is on orders approved in St. Louis, Missouri and shipped therefrom. The merchandise which is shipped into Washington is invoiced at the point of shipment and invoices are payable at point of shipment from which point collections are made. No salesman has power or authority to bind the International Shoe Company to any contract or to finally conclude any transactions in its behalf, the salesman's duties and authority being limited strictly to the solicitation of orders.

"The salesmen are under the direct control and direction of the International Shoe Company and are not permitted to be engaged in an independently established trade, occupation, profession or business of the same nature involved in their employment by the International Shoe Company.

"On October 10, 1941, a copy of Notice of Assessment by the Commissioner of Unemployment Compensation and Placement, was delivered to and left with one, E. S. ALLEY, a salesman of the International Shoe Company, at Seattle, Washington, demanding payment of delinquent contributions or interest, in the sum of $6,000. Said sum was not arrived at by calculation of the wages earned by salesmen of the International Shoe Company within the State of Washington, but was an arbitrary figure set by the Com-

missioner. E. S. Alley is a salesman of the International Shoe Company, employed upon the terms and under the authority and for the purpose as hereinabove referred to for employees of International Shoe Company within the State of Washington. A copy of the same notice of assessment was also placed in the United States mails, postage fully prepaid, addressed to International Shoe Company at St. Louis, Missouri, on the 10 day of October, 1941. Thereafter, and on the 18th day of October, 1941, International Shoe Company filed with the Department of Unemployment Compensation and Placement, its special appearance, motion to quash service and objection to jurisdiction."

The principal question is whether appellant is doing an intrastate business or is engaged in interstate commerce.

Involved in this question is the determination of whether the soliciting of business amounted to "doing business" so as to render the foreign corporation amenable to service of process.

The appellant was not properly served within the meaning of Rem. Rev. Stat., § 226, which reads:

"The summons shall be served by delivering a copy thereof, as follows:— . . .

"9. If the suit be against a foreign corporation . . . doing business within this state, to any agent, cashier or secretary thereof; . . ."

If at the time E. S. Alley, one of the salesmen mentioned in the stipulated statement of facts, was served with process, the company was doing an interstate business, of course our courts would have no jurisdiction, because the Federal government, under the provisions of subsection 3, of § 8, Art. I of the constitution, has exclusive power "To regulate commerce with foreign nations and among the several states and with the Indian tribes."

This court is committed to the rule that corporations doing an interstate business cannot be held liable to our state laws. *Lilly-Brackett Co. v. Sonnemann,* 50 Wash. 487, 97 Pac. 505; *Smith & Co. v. Dickinson,* 81 Wash. 465, 142 Pac. 1133; *Alaska Pac. Nav. Co. v. Southwark Foundry & Machine Co.,* 104 Wash. 346, 176 Pac. 357; *Rawleigh Co. v. Harper,* 173 Wash. 233, 22 P. (2d) 665; *State ex rel. Paraffine*

*Companies v. Wright,* 184 Wash. 69, 49 P. (2d) 929; *Brandtjen & Kluge v. Nanson,* 9 Wn. (2d) 362, 115 P. (2d) 731.

The phrase "doing business within this state" has been defined on many occasions. In *Smith & Co. v. Dickinson, supra,* the facts were that a foreign corporation manufactured merchandise in the state of Nebraska and sold some of its products in this state. Its method of selling was that its representatives took orders here for the merchandise and forwarded those orders to the company at Omaha for approval or rejection. If the order was accepted, the goods were shipped from Omaha to the buyer in this state and sold on credit. The salesman had offices in Seattle and Spokane, at which places he retained exhibit samples belonging to the corporation and also made trips throughout the state for the purpose of selling the goods and at times paid the expenses of proposed customers from their homes to Seattle and Spokane. The agent did not have authority to complete sales, neither could he extend credit nor make collections. In addition, the record disclosed that the agent resold certain goods to other customers and at one time went so far as to sell some of his samples, the sale being closed through the office at Omaha. This court upheld the trial court's decision that the company was not doing business in the state of Washington.

The majority opinion passes the *Dickinson* case with the observation that it is not in point because it referred to the statute relating to the payment of a fee before an action could be instituted in the courts of this state.

We did not take that view of the case in *State ex rel. Paraffine Companies v. Wright, supra.*

Nor did the Federal courts so consider it in the cases of *Johanson v. Alaska Treadwell Gold Mining Co.,* 225 Fed. 270; *Zimmers v. Dodge Brothers,* 21 F. (2d) 152; and *Klabzuba v. Southern Pac. Co.,* 33 F. (2d) 359.

The rule laid down in the foregoing case was approved in the following cases: *Macario v. Alaska Gastineau Mining Co.,* 96 Wash. 458, 165 Pac. 73; *Rawleigh Co. v. Harper, supra; State ex rel. Paraffine Companies v. Wright, supra;*

*Brandtgen & Kluge v. Nanson, supra;* and *Procter & Gamble Co. v. King County,* 9 Wn. (2d) 655, 115 P. (2d) 962.

I call the attention of the students of this problem to the extensive citation of cases in 60 A. L. R., pages 1020 to 1030, inclusive. A reading of those cases brings forth the information that the principle announced in *Smith & Co. v. Dickinson, supra,* is approved by practically all the courts in the Union.

In another line of cases, we have considered the question of whether a corporation is doing business within a certain county. This proposition has arisen in those cases in which a corporation was sued and it contended that the court did not have jurisdiction within the provisions of Rem. Rev. Stat., § 205-1 [P. C. § 8542-1], which reads:

"An action may be brought in any county in which the defendant resides, or, if there be more than one defendant, where some one of the defendants resides at the time of the commencement of the action. For the purpose of this act, the residence of a corporation defendant shall be deemed to be in any county where the corporation transacts business or has an office for the transaction of business or transacted business at the time the cause of action arose or where any person resides upon whom process may be served upon the corporation, unless hereinafter otherwise provided."

In the following cases, this court has held that a corporation was not doing business in a county unless it transacted therein a part of its usual and ordinary business, which must be continuous in the sense that it is distinguished from merely casual or occasional transactions: *State ex rel. Wells Lbr. Co. v. Superior Court,* 113 Wash. 77, 193 Pac. 229; *State ex rel. American Sav. Bank & Trust Co. v. Superior Court,* 116 Wash. 122, 198 Pac. 744; *Alto v. Hartwood Lbr. Co.,* 135 Wash. 368, 237 Pac. 987; *State ex rel. Seattle Nat. Bank v. Joiner,* 138 Wash. 212, 244 Pac. 551; *State ex rel. Yakima Trust Co. v. Mills,* 140 Wash. 357, 249 Pac. 8; *State ex rel. Harrington v. Vincent,* 144 Wash. 246, 257 Pac. 849; *State ex rel. Kerr Glass Mfg. Corp. v. Superior Court,* 166 Wash. 41, 6 P. (2d) 368; *State ex rel. Hoffman v. Su-*

*perior Court*; 168 Wash. 472, 12 P. (2d) 607; *State ex rel. Paraffine Companies v. Wright, supra.*

I call especial attention to the last state case cited, and shall discuss the Federal case later. In that case, the question presented was whether or not the Paraffine Companies was transacting business in Thurston county at the time its principal place of business was in King county. The facts were that the company sent salesmen throughout the state to call upon prospective purchasers and to obtain orders which were transmitted to Seattle. In case the orders were approved by the credit department, the sales were made in the home office. No authority to bind the company to sales was given to the salesmen, and all orders were subject to approval. Deliveries were made either from the Seattle warehouse or the factory in California. The products were sold to three merchants of Olympia, two of whom were retail dealers. One of them, the Washington Veneer Company, was supplying other dealers. The salesmen accompanied representatives of the veneer company to various dealers in Thurston county. The dealers were told that the products of the Paraffine Companies would be handled by the local company, which would supply the dealers. The transactions were made in accordance with those statements. It appears that the veneer company ordered goods through the salesmen and made payments approximately every thirty days. This court held that the Paraffine Companies was not transacting business in Thurston county and, in so doing, stated:

"While the veneer company is referred to as a distributor, it purchases from the Paraffine Companies at a discount, in the course of trade, and resells to its own customers at a profit. The other two concerns purchase, in ordinary course, the products that are needed to supply their immediate customers. While the Paraffine Companies' salesmen stimulate trade and solicit the use of its products, purchases are made by the Olympia dealers at the Seattle office.

"We are clear that the Paraffine Companies is not transacting business within Thurston county, as the term has been defined by this court:"

The decision was bottomed upon the *Dickinson* case, from which a liberal quotation was made.

I now call attention to a third series of cases in this state, some of which are not mentioned by the majority, which are directly in point and decisive of the question presented in this case.

In *Rich v. Chicago, B. & Q. R. Co.*, 34 Wash. 14, 74 Pac. 1008, this court held that a railway company was not doing business in this state when it had an agent here who solicited passenger and freight traffic. In that case, we held that the trial court's judgment quashing service upon the agent who solicited the business was correct.

In *Arrow Lbr. & Shingle Co. v. Union Pac. R. Co.*, 53 Wash. 629, 102 Pac. 650, it was held that a railway company was not doing business in this state when it maintained an office in Seattle from which advertising matter of the company was distributed and freight and passenger business was solicited. It is true that the agent was paid by other companies, but it is equally true that tickets were sold which frequently were for passage over the defendant railroad company's lines.

In *Royce v. Chicago & N. W. R. Co.*, 90 Wash. 378, 156 Pac. 16, this court approved the action of the trial court in quashing service against a railroad company. Service was made against one who was advertised as the "general agent" of the defendant. The decision was based entirely upon *Arrow Lbr. & Shingle Co. v. Union Pac. R. Co., supra.* In passing, the court stated:

"Considering the multitude of corporations and that, unlike individuals, they can be served through agents, all courts have shrunk from a rule which would soon swamp home tribunals with foreign brawls. Nor have we any desire, through the same rule, to expose our own incorporated merchants and carriers on like service to suits in every other state. Undoubtedly the universal opinion that solicitors for nonresident railroads and commercial houses are not agents for local service arises from these two apprehensions, and it was also foreseen to be unfair, as well as injurious to interstate commerce, to subject such principals to suits in our more than forty states, while the plaintiffs in most cases would be exposed to suit only at home."

In *Macario v. Alaska Gastineau Mining Co., supra,* this court determined that a mining company was not doing business in this state to an extent to give our courts jurisdiction over it. Its only business was to maintain an office in Seattle and an agent who was named "supply and forwarding agent" and whose duty it was to forward supplies to the company in Alaska. The agent also made hotel and transportation reservations for officers and employees of the company who passed through Seattle on their way to Alaska. That agent had authority to make contracts of purchase when any considerable quantities had to be approved by his home office.

In *Alaska Pac. Nav. Co. v. Southwark Foundry & Machine Co., supra,* it was held that a person was not an agent who was merely employed as a mechanical engineer of a foreign corporation for the purpose of installing a piece of machinery.

In *Watson v. Oregon Moline Plow Co.,* 113 Wash. 110, 193 Pac. 222, we held that a foreign corporation was not doing business in the state through an agent where the person who it was claimed was an agent was merely buying machinery from the foreign corporation and selling it here on his own account.

As I have mentioned, the Federal courts have passed upon this question.

In *Johanson v. Alaska Treadwell Gold Mining Co., supra,* an attempt was made to sue a gold mining company in the Federal court of this state. The defendant was a Minnesota corporation and had not complied with the laws of Washington authorizing it to do business here. It had general offices in Alaska and in San Francisco. It appeared further that its agent had purchased goods, wares, and merchandise in Seattle with direction that the same be shipped to the company at Treadwell, Alaska; that all such purchases were subject to the approval of the company; that the duties of the agent were to see that the goods were transported or forwarded from Seattle to Treadwell, Alaska; and that the agent did not pay for any goods or disburse any money. A motion was made to quash the service of summons made

upon the agent in Seattle. The Federal court granted the motion and quashed the service, and in so doing, based its decision upon, and quoted from, the *Dickinson* case, *supra.*

In *Zimmers v. Dodge Brothers, supra,* the Federal court in Illinois had before it the question of what was doing business in the state of Illinois. Referring to the facts in the case, the court set them out as follows:

"It is organized for, and does the business of, manufacturing, selling, and dealing in automobiles and automobile parts and accessories. Its principal office is Baltimore, Md. Its factories and principal place of business are located at Hamtramck, Mich., near Detroit, and that is the distributing center for the company's products. It does not have sales agents throughout the country, but sells to independent dealers, who in turn sell to associate dealers or other dealers, or directly to the ultimate purchasers or users. The relation between the company and the dealers is that of vendor and vendee. Dealers are appointed under a written 'dealer's agreement,' which becomes effective only upon execution by the company at Hamtramck after execution by the dealer. Dodge Brothers, Inc., grants to the dealer the right to purchase Dodge Brothers motor vehicles and parts for resale in a designated territory, but the manufacturer is not bound to deliver any specified quantity. The manufacturer delivers the motor vehicles and parts to the dealer, by delivering them to a common carrier at Hamtramck, Mich., and thereafter the dealer assumes all the risk of loss and damage. The dealer pays for the motor vehicles and parts purchased, either in cash at the defendant's factory or on presentation of sight draft against bill of lading. Each dealer, at his own expense, maintains salesrooms for the purposes of exhibiting and selling the motor vehicles and parts.

"The defendant has in its employ 25 district representatives, located in 25 of the principal cities of the United States. One of the district representatives is located in Chicago and has an office here. His duties are to look after the interests of the defendant in the Chicago district and to make reports to the defendant from time to time; to investigate and interview men available as dealers and submit recommendations to the officials of the defendant corporation for final approval; to observe if subdealers get an adequate supply of cars from dealers; to assist in settling disputes between dealers; to help the dealers with their sales

and service problems; to stimulate sales contests among dealers; to advise the dealers in regard to their used car problems; to inform the dealers about methods of organizing; to talk to salesmen about problems of salesmanship; and to keep the defendant fully informed of conditions prevalent and events happening with respect to the industry in his district.

"He takes no active part in the sale of motor vehicles or parts; he has no authority to make contracts on behalf of the defendant corporation, nor has he done so; he maintains his office and makes all contracts, relating to the upkeep of his office, on his own behalf, and is reimbursed for his expenditures weekly by checks from Detroit, Mich.; his salary check is sent to him bimonthly from Detroit, Mich.; he takes the lease for office space in his own name; he keeps his bank account in his own name, without reference to his position as district representative; and his letter heads do not represent him to be an agent of Dodge Brothers, Inc.

"The district representative has no authority to commit the defendant finally in any way. He has a secretary, whose salary is paid by the company's check from Hamtramck. Persons inquiring at the office in Chicago with reference to service or purchase or exchange of Dodge Brothers automobiles are referred to the Dodge dealer in Chicago. This secretary compiles information from dealers and transmits such information to the company at Hamtramck."

The court held in that case that the facts did not show that the defendant corporation was doing business in the state of Illinois, and quashed the service of summons. In passing upon the question involved, the court cited *Rich v. Chicago, B. & Q. R. Co., supra,* as sustaining authority.

*Klabzuba v. Southern Pac. Co., supra,* is another case decided in the Federal court for western Washington. In that case, an action was commenced against a Kentucky corporation which was doing some business in this state, but had not complied with our laws relative to foreign corporations doing business here. The facts show that defendant was an interstate carrier by a railroad, but did not own any railroad in the state of Washington nor did it receive, carry, or deliver passengers or freight in this state. Service was made upon an employee of the company whose duty it was to solicit for passenger and freight traffic. The defend-

ant maintained an office in the city of Seattle in charge of a representative who made the solicitations for passenger and freight traffic. It further appears that, when application was made, through tickets were issued from Seattle to outside points on the defendant's line by three railroad companies; that, to expedite the service, blocks of tickets were carried in stock by representatives of defendant and bore the name of one of the initial carriers, but not that of the company sued. Relative to the tickets, the facts show that they constituted a contract between the initial carrier and the passenger, the price being collected by the Southern Pacific; that thereafter an adjustment was made between that railroad company and the initial carrier; and that the defendant ultimately received from the initial carrier its share of the total purchase price.

The court referred to *Johanson v. Alaska Treadwell Gold Mining Co., supra,* and held that the actions of the defendant company did not constitute doing business in the state within the purview of the law giving the court jurisdiction; and, in so doing, cited as its authority *Rich v. Chicago, B. & Q. R. Co., supra; Arrow Lbr. & Shingle Co. v. Union Pac. R. Co., supra; Royce v. Chicago & N. W. R. Co., supra;* and *Macario v. Alaska Gastineau Mining Co., supra.*

The first series of cases just discussed lays down a definite uniform rule which defines doing business within this state. The second series follows the reasoning of the first and announces a rule as to what constitutes doing business in a county.

The third series of cases announces the rule relative to what amounts to doing business in this state in order to subject a corporation to actions in the state. A study of these cases brings forth the information that one precise definition of the phrase has been applied and used by this and other courts in determining whether a corporation is doing business within the meaning of Rem. Rev. Stat., §§ 205-1, 226 (9), or Rem. Rev. Stat. (Sup.), § 3836-2 [P. C. §§ 8542-1, 8438, 4656-52].

We should adhere to established rules and principles so long as they do not indicate a palpable mistake or violate

justice, reason and law. If we do find that some of our decisions violate the principles just mentioned, we should overrule those decisions and announce a new and proper rule.

In this state, we have one definition for negligence, one for contributory negligence, one for reasonable doubt, and one for proximate cause, including many other words and clauses used by lawyers and judges; and up until the present time, we have had one definition of what constitutes doing business in the state of Washington. I fail to see any reason for changing our rule and providing for two definitions of what is doing business within this state. The only purpose I can see is to give to the unemployment compensation commission a right not accorded to ordinary litigants.

I repeat, if the majority opinion prevails, we will have in this state two definite definitions of doing business which will confuse judges, lawyers, and laymen alike.

To show the baffling condition of our cases which will arise if the majority opinion prevails, I submit the following reasonable assumed situation:

Two actions are commenced upon the same day and filed in the superior court for Thurston county, one of them by John Doe Company against Smith & Company. The second is the state of Washington against the John Doe Company.

In the first complaint, the plaintiff alleges that, between the first day of June, 1943, and the 10th day of August, 1944, plaintiff sold and delivered to the defendant goods, wares, and merchandise of the agreed value of one thousand dollars, which defendant refused to pay, though demand has been made therefor; that the plaintiff is a foreign corporation, has not filed its articles of incorporation with the secretary of state of the state of Washington, nor has it paid its annual license fee to the state of Washington; that its business within this state is interstate business conducted in the following manner:

Plaintiff is an Illinois corporation having its business in the city of Chicago, where it manufactures washing machines and sells the same in various states of the Union, in-

cluding the state of Washington. In the state of Washington its merchandise is sold through several selling divisions or branches in Spokane, Seattle, and Olympia. It maintains no general agent in the state of Washington and makes no contracts of sale in the state. It does not maintain a stock of merchandise in this state and makes no deliveries of merchandise herein. That the manner in which the business is conducted in the state of Washington is generally as follows:

Salesmen are employed from the Chicago office and work under the direct supervision and control of the sales managers in Chicago and are required as part of their duties to spend a certain portion of their time in Chicago for the purpose of receiving direct personal instructions as to their duties relative to the line of machines sold to the trade and the method of selling; further to receive information with reference to construction and new types and kinds of washing machines which are to be offered. The employees or salesmen are given a sample machine, but no sales are made of such samples, they being used for purposes of display to prospective purchasers. Some of the salesmen rent sample rooms in business buildings and expenses of the rental and maintenance are paid by them and they are then reimbursed on an expense account by plaintiff. Some salesmen maintain no permanent sample rooms, but rent rooms in hotels or business buildings in the cities through which they travel. Each salesman is given a designated territory in which to solicit orders. The authority of each salesman is limited to exhibiting samples of the machines for which they solicit orders for the merchandise.

Salesmen endeavor to procure orders on prices and terms fixed by plaintiffs. If orders are obtained, they are transmitted to the office of plaintiff in Chicago, Illinois, for acceptance or rejection, and if orders are accepted by the plaintiff, the merchandise is shipped f. o. b. from shipping points in the state of Washington. The merchandise which is shipped into Washington is invoiced at the point of shipment and the invoices are payable at point of shipment, from which point collections are made. The salesmen have

no power or authority to bind plaintiff to any contract or to finally conclude any transaction in its behalf, their duties and authority being limited strictly to the solicitation of orders. It is further alleged that the salesmen are under the direct control and direction of plaintiff and are not permitted to engage in any independently established trade, occupation, profession, or business of the same nature involved in their employment by plaintiff.

The second complaint was filed by the state of Washington, seeking to collect taxes for unemployment compensation insurance from plaintiff. John Doe Company's salesman in Seattle or Olympia is served with complaint and summons, and the company then moves to quash the service on the ground that it is not doing business in this state, and bases its motion upon the allegations of the complaint which are identical with the allegations contained in plaintiff's complaint against Smith & Company except as to designation of individuals. Counsel, with the consent of the trial court, agree to argue the cases at the same time.

The trial court is faced with the answer to one question: What amounts to doing business in this state? The trial court then, in rendering its decision upon identical facts, must hold in the first case that plaintiff is not doing business in this state, and in the second case that the same individual is doing business in the state.

There are hundreds of cases written on the subject we have before us. However, it would serve no useful purpose to cite them in this opinion.

I shall content myself by calling attention to the cases cited by the majority. In so doing, I will pay particular attention to the factual situations as compared with those in this case. I shall do this for the reason that each case must necessarily depend on its own facts. *St. Louis W. R. Co. of Texas v. Alexander*, 227 U. S. 218, 57 L. Ed. 486, 33 S. Ct. 245.

In *Green v. Chicago, B. & Q. R. Co.* (1907), 205 U. S. 530, 51 L. Ed. 916, 27 S. Ct. 595, plaintiff brought an action for personal injuries in the Federal court for the eastern district of Pennsylvania. The action was against the Chicago,

Burlington & Quincy Railway Company, incorporated in Iowa. The sole question presented in that case was the sufficiency of process for jurisdiction in the Federal court. The following facts were present:

The eastern point of the railroad was at Chicago, from which place its tracks extended westward. The business for which it was incorporated was the carriage of freight and passengers and the construction, maintenance and operation of the railroad for that purpose. According to the business methods generally pursued, freight and passenger traffic was solicited in other parts of the country than those through which the defendant's tracks ran. For the purpose of conducting this business, defendant employed one Heller, supplied an office for him in Philadelphia, designated him as "district freight and passenger agent," and in many ways advertised these facts to the public. The business of the agent consisted of soliciting and procuring passengers and freight to be transported over the defendant's line. In conducting this business, the company employed several clerks and various traveling passenger and freight agents, who reported to and acted under the direction of the agent. The agent could not sell tickets or receive payment for transportation of freight. When a prospective passenger desired a ticket, he applied to the agent, who took the applicant's name and procured a ticket from one of the railroads running west from Philadelphia. The ticket was on a prepaid order, and the applicant, upon arriving in Chicago, had a right to receive from the defendant company a ticket over that road. At various times, the agent sold tickets to railroad employees who had tickets over intermediate lines. In some cases, to suit the convenience of shippers who had received bills of lading from an initial line for goods routed over the defendant's lines, the agent gave in exchange therefor bills of lading over defendant's line. The bills of lading recited that they should not be in force until the freight had been actually received by defendant.

Touching the validity of the service upon the agent, the court said it depended upon

" . . . whether the corporation was doing business in that district in such a manner and to such an extent as to warrant the inference that through its agents it was present there."

The court further said:

"The business shown in this case was in substance nothing more than that of solicitation. Without undertaking to formulate any general rule defining what transactions will constitute 'doing business' in the sense that liability to service is incurred, we think that this is not enough to bring the defendant within the district so that process can be served upon it."

This case has never been overruled, though in some cases it has been distinguished because of a different factual situation existing in the other cases. The rule announced in the above case has been followed by the United States supreme court eight times, by the Federal courts one hundred twelve times, and by the state courts eighty-six times. This court has adhered to the ruling in *Arrow Lbr. & Shingle Co. v. Union Pac. R. Co., supra.*

Among the many cases upholding the rule just announced are: *St. Louis S. W. R. Co. of Texas v. Alexander* (1913), 227 U. S. 218, 57 L. Ed. 486; *International Harvester Co. v. Kentucky* (1914), 234 U. S. 579, 58 L. Ed. 1479; *Tyler Co. v. Ludlow-Saylor Wire Co.* (1915), 236 U. S. 723, 59 L. Ed. 808, 35 S. Ct. 458; *People's Tobacco Co. v. American Tobacco Co.* (1918), 246 U. S. 79, 62 L. Ed. 587; *Minnesota Commercial Men's Ass'n v. Benn* (1923), 261 U. S. 140, 67 L. Ed. 573, 43 S. Ct. 293; and *Davis v. Farmers Co-op. Equity Co.* (1923), 262 U. S. 312, 67 L. Ed. 996, 43 S. Ct. 556.

In the *Harvester Co.* case, referred to by the majority as the leading case upon the subject, the facts were stated as follows:

" 'The Company's transactions hereafter with the people of Kentucky must be on a strictly interstate commerce basis. Travelers negotiating sales must not hereafter have any headquarters or place of business in that State, but may reside there.

" ' Their authority must be limited to taking orders, and all orders must be taken subject to the approval of the general agent outside of the State, and all goods must be

shipped from outside of the State after the orders have been approved. *Travelers do not have authority to make a contract of any kind in the State of Kentucky. They merely take orders to be submitted to the general agent. If any one in Kentucky owes the Company a debt, they may receive the money, or a check, or a draft for the same but they do not have any authority to make any allowance or compromise any disputed claims.* When a matter cannot be settled by payment of the amount due, the matter must be submitted to the general or collection agent, as the case may be, for adjustment, and he can give the order as to what allowance or what compromise may be accepted. All contracts of sale must be made f. o. b. from some point outside of Kentucky and the goods become the property of the purchaser when they are delivered to the carrier outside of the State. Notes for the purchase price may be taken and they may be made payable at any bank in Kentucky. All contracts of any and every kind made with the people of Kentucky must be made outside of that State, and they will be contracts governed by the laws of the various States in which we have general agencies handling interstate business with the people of Kentucky. For example, contracts made by the general agent at Parkersburg, W. Va., will be West Virginia contracts.'" (Italics mine.)

It will be noticed that I have italicized more of the facts than the majority. I have done this because I contend that the court took notice of all of the facts in the case, including "If any one in Kentucky owes the Company a debt, they [travelers] may receive the money, or a check, or a draft for the same."

On page 587 of the opinion, the court re-emphasized the facts by stating:

*"In the case now under consideration there was something more than mere solicitation. In response to the orders received, there was a continuous course of shipment of machines into Kentucky. There was authority to receive payment in money, check or draft, and to take notes payable at banks in Kentucky."* (Italics mine.)

The court upheld the *Green* case, but was of the opinion that it did not apply because the factual situation was entirely different.

The holding in the *Harvester Co.* case could not have been based entirely upon the continuous course or flow of busi-

ness, because there was a continuous course of business conducted by the companies in both cases.

I call attention to the fact that the facts in the case at bar are like those in the *Green* case and entirely dissimilar to those present in the *Harvester Co.* case. The *Green* case *is* in point, and the latter case is not in point.

At this time, I desire to emphasize the point that this court has repudiated the continuous flow of business theory in *Brandtjen & Kluge v. Nanson, supra.* In passing upon the question of the effect that the number of transactions had upon the question of doing business in this state, we stated:

"The appellant seeks to distinguish the case of *Smith & Co. v. Dickinson* by saying that, in that case, there was only proof of 'isolated transactions' in this state. However, the opinion in that case shows on its face that the transactions of the plaintiff were no more isolated than were the transactions in this case. *Whether a foreign corporation is doing business in this state does not depend upon the number of transactions that it has, but upon the nature and character of the transactions.*" (Italics mine.)

The majority stress the holding in *Tauza v. Susquehanna Coal Co.,* 220 N. Y. 259, 115 N. E. 915, in which it was held that a continuous flow of interstate business constituted doing business by a corporation in a state foreign to its place of organization. The writer of the opinion based his holding upon the *Harvester Co.* case, but failed to note the factual situation present in that case, which was that, in addition to soliciting business, the Harvester Co. employees made collections for their company.

The supreme court of the United States, in the *People's Tobacco Co.* case, adhered to this idea by saying:

"The plaintiff in error relies upon *International Harvester Co. v. Kentucky,* 234 U. S. 579, but in that case the facts disclosed that there was not only a continuous course of business in the solicitation of orders within the State, but there was also authority upon the part of such agents to receive payment in money, checks and drafts on behalf of the company, and to take notes payable and collectible at banks in Kentucky; these things, taken together, we held amounted to doing business within the State of Kentucky in such

manner as to make the Harvester Company amenable to the process of the courts of that State."

The Federal courts in the following cases recognized that the holding in the *International Harvester Co.* case was grounded upon the fact that agents were doing business by making collections: *Hilton v. Northwestern Expanded Metal Co.*, 16 F. (2d) 821; *Cone v. New Britain Mach. Co.*, 20 F. (2d) 593; *Buffalo Batt & Felt Corp. v. Royal Mfg. Co.*, 27 F. (2d) 400; *Davega, Inc. v. Lincoln Furniture Mfg. Co.*, 29 F. (2d) 164. The facts and holding in the last case are so persuasive that I quote from them at length.

"(1) The defendant secured orders in New York through Shlivek for about $200,000 of furniture per year;

"(2) The defendant sold in New York through Shlivek about $1,000 of furniture per year, which had been shipped there for samples; Shlivek collected some overdue accounts.

"(3) The president and sales manager have come here 10 or 11 times a year, and while here have discussed business matters with Shlivek, and have also at times adjusted accounts with customers.

"(4) The sales manager, C. C. Lincoln, Jr., while in New York, arranged the contract for radio cabinets on which this action is brought, and has also solicited here other orders in radio cabinets.

"This is a very close case. The Supreme Court has said that the test of whether a foreign corporation is amenable to process depends upon whether 'it is doing business within the state in such manner and to such extent as to warrant the inference that it is present there.' *Philadelphia & Reading Ry. Co. v. McKibbin*, 243 U. S. at page 265, 37 S. Ct. 280, 61 L. Ed. 710; *People's Tobacco Co. v. American Tobacco Co.*, 246 U. S. at page 87, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537; *Rosenberg Co. v. Curtis Brown Co.*, 260 U. S. at page 517, 43 S. Ct. 171, 67 L. Ed. 372. This is a mere reiteration of the earlier statement by the same court that it 'has decided each case of this character upon the facts brought before it and has laid down no all-embracing rule by which it may be determined what constitutes the doing of business by a foreign corporation in such manner as to subject it to a given jurisdiction.' *St. Louis Southwestern Ry. Co. v. Alexander*, 227 U. S. at page 227, 33 S. Ct. 248, 57 L. Ed. 486.

"We are, in short, aided only by comparing those decisions in which the facts have been held to show the presence of corporations in foreign states, for the purpose of subjection to the jurisdiction, and the contrary. It has been definitely determined that the mere renting of an office and solicitation of business in the foreign state is insufficient to subject the corporation to service of process. *W. S. Tyler Co. v. Ludlow-Saylor Wire Co.*, 236 U. S. 723, 35 S. Ct. 458, 59 L. Ed. 808; *People's Tobacco Co. v. American Tobacco Co.*, 246 U. S. 79, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537. Nor is the fact (if it be the fact, as is disputed) that the cause of action asserted here arose in New York material, unless the corporation was doing business in the sense that is required to subject it to jurisdiction. *Rosenberg Co. v. Curtis Brown Co.*, 260 U. S. at page 518, 43 S. Ct. 170, 67 L. Ed. 372.

"The plaintiff says that much more was done here than the solicitation of orders, and especially relies on *International Harvester v. Kentucky*, 234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479. In that case the traveling salesmen of the harvester company did far more than to take orders to be accepted outside of the state. While it was generally provided, as in the present case, that 'all contracts of sale must be made f. o. b. from some point outside of Kentucky, and the goods become the property of the purchaser when they are delivered to the carrier outside of the state,' the agents were authorized to receive money, checks, or drafts from any one within the state who might owe the company and take notes of customers payable therein.

"Here Shlivek [the agent] was paid nothing for collecting accounts. He received no salary, but was only paid a commission based on the contracts which originated through him, and not on the amount realized. He did not receive payment for the furniture shipped from Virginia, or even have a record of the accounts. He occasionally adjusted disputes, subject to the approval of the home office, and procured payment of *overdue* indebtedness. The president and vice president of the corporation came into New York a few times a year, and made, or sought to make, adjustments; but, if occasional adjustments of accounts within the state are to be regarded as sufficient to subject a corporation to the jurisdiction, no foreign corporation can solicit business in any volume without becoming liable to service of process. Such a result seems a sufficient answer to the suggestion that the adjustment of disputes with customers strengthens the plaintiff's case. The situation is different

from that in the *Harvester* case, where the course of business involved not collection of *overdue* accounts, but regular payment in the foreign state."

I can have no quarrel with the following cases cited by the majority, because in each of them the foreign corporation employed collectors in the state where they were working: *Lamont v. S. R. Moss Cigar Co.,* 218 Ill. App. 435; *Hormel & Co. v. Ackman,* 117 Fla. 419, 158 So. 171; *Wheeler v. Boyer Fire Apparatus Co.,* 63 N. D. 403, 248 N. W. 521; *International Shoe Co. v. Lovejoy,* 219 Iowa 204, 257 N. W. 576; *Dobson v. Maytag Sales Corp.,* 292 Mich. 107, 290 N. W. 346.

In fact, the *Wheeler* case was based upon the entire holding in the *Harvester Co.* case, from which we have quoted at length.

The case of *American Asphalt Roof Corp. v. Shankland,* 205 Iowa 862, 219 N. W. 28, was based upon the *Harvester Co.* and *Tauza* cases, and the writer of the opinion was guilty of the same sin of omission as the writer of the *Tauza* case in that he did not give full credit to all of the facts in the *Harvester Co.* case.

In all of the other cases mentioned by the majority are to be found facts similar to those in the *Harvester Co.* case in that the foreign corporation allows its agents to make collections or to do some other item of local business.

This is especially true of *West Pub. Co. v. Superior Court,* 20 Cal. (2d) 720, 128 P. (2d) 777, in which it appears that the salesmen accepted an initial payment upon books sold and helped collect delinquent accounts.

An exception is *Dahl v. Collette,* 202 Minn. 544, 279 N. W. 561, the writer of which case committed the same error charged in the *Tauza* case.

The case of *Harbich v. Hamilton-Brown Shoe Co.,* 1 F. Supp. 63, was decided upon the factual situation shown by affidavit. One of the affidavits indicated the following facts:

"After selecting the line of shoes that I desire for my trade, the sales agent then quotes me prices on these shoes and, if the prices are such that I conclude that I can use the shoes profitably, I accept his offer as quoted and direct him

to ship me the shoes agreed upon, telling him the sizes that I desire for my trade and he transmits this order to the Hamilton-Brown Shoe Company and it delivers me the shoes in accordance with the trade I have made with its drummer or salesman."

*Frene v. Louisville Cement Co.*, 134 F. (2d) 511, is not in point because the facts are entirely unlike those in the instant case. To show their difference, I quote as follows:

"However, it is admitted that he [Lovewell, the agent] frequently visits jobs in course of construction where the defendant's products are being used. On these occasions he 'would note the manner in which the products were being installed or used and if any difficulties were being experienced, he would make suggestions as to how to overcome them; he would also go over any complaints with regard to the materials' and report them to the home office. He had no authority finally to make adjustments or compromises. Lovewell called at the plaintiffs' house three or four times during the course of construction and 'half a dozen times' at another job then being done in the District for the Government. In connection with the latter, he took specimens of the work to government agents 'for testing purposes . . . to have approval by the Government.' During these visits he inspected the work as it progressed, saw that the Brixment was properly mixed, was being properly spread, was being used as the defendant intended, and pointed out the values of different brick textures and bondings when used with Brixment. According to the plaintiff Leo Frene, Lovewell carefully looked over the plans and specifications for his house, 'visited the work regularly while in course of construction, and pointed out minor and major details to the brick-masons.' Frene also stated he knew 'of many other jobs where said Lovewell has not alone sold the Brixment, but has participated in and exhibited his engineering ability and fitness in order to promote and advance the general scheme of the work.'

"Lovewell testified that his employer 'told me to go on the job and see how they are progressing, how they like the material, how they are satisfied with it, and so forth' and 'the idea is to use my best judgment in promoting satisfactory use of this material.' The record further shows that Lovewell regularly secured information for his employer from various governmental agencies and departments, including the Bureau of Standards, the Procurement Division of the Treasury Department and the Government Printing

Office. He admitted this work called upon 'his engineering ability and not his sales ability,' that it related in part to specific matters affecting his employer's work, such as failure of its materials to pass government specification with resulting throwback by the contractor, and that the defendant would write instructing him to check up on the matter. He was useful also in securing more general information."

The above opinion contains a lengthy dissertation on the question of doing business. However, the essay has nothing to do with the factual situation present in the case nor with the applicable law. It is only an argument in favor of the so-called "modern trend."

A careful reading of the cases cited by the majority as upholding its contentions reveals that in only two of them, the *Tauza* and *Dahl* cases, do the facts coincide with those with which we are dealing.

It seems to me that the judgment should be reversed for two reasons: (1) that this court has at various times, upon facts alike to those present here, laid down a definite rule as to what constitutes doing business in this state, which rule is contrary to the one adopted by the majority; and (2) the cases from other jurisdictions have in fact announced rules contrary to those upon which the majority bases its holding.

MILLARD, J., concurs with SIMPSON, C. J.

---

February 6, 1945. Petition for rehearing denied.